## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CELADON GROUP, INC., et al., | : | Case No. 19-12606 (KBO) |
| | : | |
| Debtors. | : | (Jointly Administered) |

| | | |
|---|---|---|
| TA DISPATCH, LLC, an Alabama limited liability company. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. No. _____ |
| | : | |
| MIDCAP FUNDING IV TRUST, a Delaware statutory trust, | : | |
| | : | |
| Defendant. | : | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Defendant MidCap Funding IV Trust ("Defendant") files this Notice of Removal pursuant to, *inter alia*, 28 U.S.C. §§ 1334 and 1452 and Federal Rule of Bankruptcy Procedures 9027(a)(1) and 9001(3), and removes to the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), where the voluntary chapter 11 proceedings involving the Celadon Group, Inc. and certain of its affiliates (the "Debtors") are pending, the above-entitled action from the Superior Court of the State of Delaware (the "Superior Court"), and all claims and causes of action asserted therein. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). In support of this Notice of Removal, Defendant states as follows:

1.      This action was commenced on January 6, 2020, by the filing of a summons and complaint (the "MidCap Complaint" or "Compl.") in the Superior Court, case number N19C-12-

237 MMJ CCLD, a true and correct copy of which is attached hereto as <u>Exhibit A</u>.[1]  The MidCap

Complaint was served on Defendant in Delaware on January 13, 2020.  *See* Declaration of David

E. Morrison (hereinafter, "<u>Morrison Decl.</u>"), attached hereto as <u>Exhibit B</u>, at ¶ 3; Exh. 1.)

     2.     In accordance with 28 U.S.C. § 1446(a) and Federal Rule of Bankruptcy

Procedure 9027(a)(1), true and correct copies of all process, pleadings and orders filed in the

Superior Court to date are attached as <u>Exhibit C</u> to this Notice of Removal.

     3.     Defendant has timely filed this Notice of Removal within 30 days of receipt,

through service or otherwise, of a copy of the initial pleading in accordance with 28 U.S.C. §

1446(b) and Fed. R. Bankr. P. 9027(a)(3).  *See Murphy Bros., Inc. v. Michetti Pipe Stringing,*

*Inc.*, 526 U.S. 344 (1999) (holding that 30-day time period under removal statute begins to run

from the date of formal service).

     4.     Removal of this action to the Bankruptcy Court is proper pursuant to 28 U.S.C.

§ 1441(a) because this District encompasses the Superior Court, the forum in which this action is

pending.  Further, pursuant to 28 U.S.C. § 157 and the United States District Court for the

District of Delaware's Amended Standing Order of Reference, dated February 29, 2012, all cases

related to a case under the Bankruptcy Code are automatically referred to the Bankruptcy Court

and the Bankruptcy Court presiding over the Debtors' bankruptcy proceedings has original

jurisdiction over the causes of action asserted in this case.

     5.     Pursuant to 28 U.S.C. § 1446(d) and Fed. R. Bankr. P. 9027(b)-(c), Defendant

will file a copy of this Notice of Removal with the Clerk of Court for the Superior Court. It also

will promptly serve a copy of this Notice of Removal on counsel for the Plaintiff.

---

[1] Plaintiff filed the Complaint in the Superior Court under seal.  Subsequently, respective counsel for the Defendant, the Plaintiff and the Debtors have each consented that the version of the Complaint attached hereto as Exhibit A (without any redactions) shall be considered the public version of the Complaint.

6.      This action is properly removable to this Court under 28 U.S.C. §§ 1334 and 1452 and Federal Rule of Bankruptcy Procedures 9027.

**I.   Background**

7.      Plaintiff and the Debtors were parties to certain agreements (the "Celadon Transaction Documents"), entered into on or about April 15, 2019.  (Compl. ¶ 23.)  A copy of the Celadon Transaction Documents are attached to the MidCap Complaint.[2]  Defendant is not party to those agreements.

8.      On July 31, 2019, certain of the Debtors (the "ABL Borrowers") entered into that certain Credit and Security Agreement (the "Prepetition ABL Credit Agreement") with Defendant, as successor by assignment from MidCap Financial Trust, as administrative agent and lender (the "Prepetition ABL Agent"), and certain lenders party thereto (the "Prepetition ABL Secured Lenders"; together with the Prepetition ABL Agent, the "Prepetition ABL Secured Parties").  (Morrison Decl. ¶ 4.)  Pursuant to the Prepetition ABL Credit Agreement, the Prepetition ABL Secured Parties provided a revolving loan credit facility to the ABL Borrowers, pursuant to which the ABL Borrowers remitted collections to the Prepetition ABL Agent on a daily basis for application to the outstanding loans, and the Prepetition ABL Secured Lenders then made advances to the ABL Borrowers upon the delivery of a borrowing request from such ABL Borrowers.

**A.  Plaintiff Filed A Verified Complaint Seeking $6.2 Million From The Debtors.**

9.      On or about December 2, 2019, Plaintiff filed a Verified Complaint against the Debtors in the Court of Chancery of the State of Delaware, Case No. 2019-0960-SG (the "Verified Celadon Complaint"). (Morrison Decl. ¶ 5, Exh. 2).  The Verified Celadon Complaint

---

[2] Exhibits A through D to the MidCap Complaint were filed under seal in that action and have not been made publicly available.  These documents will be provided to this Court following the resolution of any confidentiality concerns.

asserts, among other things, that the Debtors failed to pay Plaintiff approximately $6.2 million, which Plaintiff describes as "Plaintiff's earmarked funds," and instead used the "funds to run their business operations…." *See* Morrison Decl. Exh. 2, at ¶¶ 1, 6.  Plaintiff further alleged in the Verified Celadon Complaint that the Chief Executive Officer for Celadon Group, Inc. advised Plaintiff on November 26, 2019, that the Debtors had not "segregated" the accounts receivable at issue, *id*. at ¶ 61, and indeed the Celadon Transaction Documents do not impose any obligation on the Debtors to segregate the funds at issue.

10.     Instead, Plaintiff contends in the Verified Celadon Complaint that the Debtors "spent most, if not all, of" the proceeds of receivables that were in the Debtors' possession, but which Plaintiff contends it owns.  *Id*. at ¶¶ 61, 63.  The Verified Celadon Complaint also acknowledges, "certain creditor(s) … have the ability to … sweep [Debtors'] bank accounts." *Id*. at ¶ 85.

**B.  The Debtors Filed A Chapter 11 Bankruptcy Petition.**

11.     On December 8, 2019, Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code") with the Bankruptcy Court.  (Compl. ¶ 52.)  The Debtors' cases are jointly administered under case number 19-12606 (KBO) in the Bankruptcy Court.  (Morrison Decl., ¶ 6.)

12.     As a result of the chapter 11 petitions, the Verified Celadon Complaint was automatically stayed. (Morrison Decl., ¶ 7.)

**C.  Plaintiff Filed A Complaint Seeking The Same $6.2 Million From Defendant.**

13.     On January 6, 2020, Plaintiff commenced this action.  The allegations asserted in the MidCap Complaint are based on the same factual transactions alleged in the Verified Celadon Complaint.  In the MidCap Complaint, Plaintiff contends that the Debtors failed "to

remit to Plaintiff approximately $6.2 million of funds earmarked for, and belonging solely to, Plaintiff after Defendant improperly swept these funds from the bank accounts of companies that were required to hold Plaintiff's money." (Compl. ¶ 1.)  Indeed, Plaintiff recognizes, as it must, that the Debtors alone decided how to operate their business and whom to pay.  *See id*. at ¶ 38 ("The Celadon Companies initially remitted to Plaintiff the Accounts Receivable and CSA Proceeds in accordance with the Transaction Documents.  However, on or about August 6, 2019, the Celadon Companies began delaying payment and failing to remit the full amount due.  More recently, the Celadon Companies ceased remitting the Accounts Receivable and CSA Proceeds.  The Celadon Companies failed to make these payments to Plaintiff because they began using Plaintiff's funds to prop up their business operations in an attempt to avoid (or at least better position themselves for) bankruptcy.").  In the MidCap Complaint, Plaintiff also recognizes that "Defendant, in its capacity as a lender to Celadon Parent … may have a contractual right to sweep funds owned by the Celadon Companies …"  (*Id.* ¶ 13.)

14.    Thus, central to both the Verified Celadon Complaint and the MidCap Complaint is the threshold issue of whether the $6.2 million at issue constitutes "funds owned by the Celadon Companies" or "Plaintiff's property."  A ruling that such funds were owned by the Debtors ends the inquiry as it relates to the Plaintiff's claims asserted against Defendant.

### D.  The Bankruptcy Court Entered A Financing Order Authorizing The Use Of Cash Collateral Of The Defendant, As Prepetition ABL Agent.

15.    On December 10, 2019, the Bankruptcy Court entered an interim order authorizing the Debtors to continue to use certain cash collateral of the Prepetition ABL Secured Parties subject to the terms and conditions set forth therein and, on January 7, 2020, the Bankruptcy Court entered its final order (collectively, the "Financing Order") (D.I. 61 & 230). (Morrison Decl., at Exhs. 4-5.) The Bankruptcy Court also entered a final order approving the

Debtors' use of a cash management system, including the maintenance of dominion accounts as noted therein.  (D.I. 238; Morrison Decl., at Exh. 6.)

16.    Over Plaintiff's objections[3] to the entry of the Financing Order, the Bankruptcy Court authorized the Debtors' use of certain cash collateral, and directed the Debtors to remit cash collateral in their possession or control to the Prepetition ABL Agent, including, by depositing cash collateral into certain of the Debtors' deposit accounts subject to a blocked account control agreement requiring that funds be remitted to the Prepetition ABL Agent on a daily basis.  *See* Financing Order, at § 3.2(a); Morrison Decl., Exhs. 4-5. The Bankruptcy Court's orders also required that the Debtors institute post-petition procedures to identify and segregate proceeds of accounts receivables owned by Plaintiff and received by the Debtors.  *Id* at § 3.2(c) and (d).

17.    Plaintiff's counsel has already made clear the direct connection between Plaintiff's asserted property rights in the $6.2 million and the bankruptcy cases.  At the December 10, 2019 hearing before the Bankruptcy Court, Plaintiff's counsel argued the following in connection with Plaintiff's objection to the entry of the Financing Order (D.I. 45 & 195):

> For the record, we believe that there are approximately … $6.2 million dollars in pre-petition accounts receivable that were never remitted to my client.  We believe … it would be wise to escrow an amount like that pending entry of the final DIP order.  However, after talking with counsel that might not be possible because, as I understand it, there are daily sweeps of the bank account, and … that amount may not exist anymore, it may not be in the debtors' possession…. We also want to reserve our rights to the extent that any of the purchase accounts

---

[3]  *See* Morrison Decl. ¶ 8, Exh. 3.  It should be noted that Plaintiff waived any right it had to contest the Bankruptcy Court's jurisdiction over its objections submitted in the Debtors' bankruptcy cases by failing to state that it did not consent to that court's jurisdiction in its written objections, pursuant to Delaware Bankruptcy Court Local Rule 9013-1(h) ("All objections or other responses to a motion filed pursuant to this Rule shall contain a statement that the filing party does or does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  If no such statement is included, the filing party shall have waived the right to contest the authority of the Court to enter final orders or judgments.").

> receivable are improperly included as collateral for any pre-petition liens or DIP financing, or to the extent that they were misappropriated or otherwise converted, basically, again the 6.2 million dollars that we haven't received yet.

Morrison Decl. Exh. 7 (relevant portions of the transcript of the December 10, 2019 hearing in the matter of *In re Celadon Group, Inc., et al.*, Case No. 19-12606 (KBO), including pages 75-76).

### E. The Debtors Removed The Verified Celadon Complaint To The Bankruptcy Court.

18.     On January 17, 2020, the Debtors removed the Celadon State Court Action to the Bankruptcy Court ("Debtors' Removal Petition").  *See* Morrison Decl., Exh. 9; *see also* D.I. 315; *TA Dispatch, LLC v. Celadon Group, Inc., et al.*, Adv. No. 20-50117-KBO.[4] In the Debtors' Removal Petition, the Debtors contended that "[t]he allegations asserted and relief sought by TA Dispatch in the State Court Action are directly related to Debtors' Final DIP Order and corresponding budget, *as well as whether certain property is property of the estates*, all of which are at issue in the pending bankruptcy proceedings." *Id.* at p 10 (emphasis added).  Accordingly, the Debtors have disputed the Plaintiff's claim that the $6.2 million at issue in the Verified Celadon Complaint and the MidCap Complaint is Plaintiff's property.

## II.     Grounds for Removal

### A. *The Complaint Is Removable Under 28 U.S.C. § 1334 Because It Is Related To A Case Under Title 11.*

19.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1334(b) and 1452(a), which provides a district court with original jurisdiction to hear all civil proceedings that are "related to cases under title 11."  28 U.S.C. § 157(a) permits the district court to have such cases "be referred to the bankruptcy judges for the district," and that the

---

[4] After removal and being assigned an Adversary Proceeding Case Number, Defendant intends to file a motion to consolidate this adversary proceeding with the related matter of *TA Dispatch, LLC v. Celadon Group, Inc., et al.*, Adv. No. 20-50117-KBO.

bankruptcy court "may hear and determine [such] case… and may enter appropriate orders and judgments, subject to review under section 158 of this title."  28 U.S.C. § 157(a) & (b)(1).

20.     A proceeding generally meets the jurisdictional threshold of "related to" jurisdiction under 28 U.S.C. §1334(b) if the outcome of that proceeding "could conceivably have any effect on the estate being administered in bankruptcy.  The key word in the test is 'conceivable' and certainly, or even likelihood, is not a requirement."  *In re Zinchiak*, 406 F. 3d 214, 226 (3d Cir. 2005); *see also Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (holding that the "related to" threshold "is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy…. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."); *see also In re W.R. Grace & Co.*, 591 F.3d 164, 171 (3d Cir. 2009); *In re Fed.-Mogul Glob., Inc.*, 300 F.3d 368, 382 (3d Cir. 2002).

21.     Congress intended for non-core "related to" jurisdiction to grant "comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate."  *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (quoting *Pacor*, 743 F.2d at 994) (internal quotations omitted).  "Non-core 'related to' jurisdiction is the broadest of the potential paths to bankruptcy jurisdiction."  *Resorts Int'l Financing, Inc. v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154 (3d Cir. 2004).

22.     This action will directly affect the Debtors' bankruptcy estates and their creditors. As set forth in the Financing Order, the Prepetition ABL Obligations (as defined in the Financing Order) are secured by valid, enforceable and properly perfected first priority liens on the ABL

Priority Collateral (as defined in the Financing Order) and valid, enforceable and properly perfected second priority liens on the Term Loan Priority Collateral (as defined in the Financing Order).   Pursuant to the Prepetition ABL Credit Agreement, the Debtors are required to indemnify, pay and hold harmless Prepetition ABL Agent, Prepetition ABL Lenders and the other Indemnitees (as defined therein) from, among other things, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suit, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the fees and disbursements of counsel for such Indemnitee) in connection with any investigative, responsive, remedial, administrative or judicial matter or proceeding, which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the transactions contemplated by the Prepetition ABL Credit Agreement and the other Operative Documents (as defined in the Prepetition ABL Credit Agreement).   As a result of this action, Prepetition ABL Agent has notified the Debtors of their obligation to indemnify the Prepetition ABL Secured Parties, as set forth in that certain Notice of Indemnification Obligations and Reservation of Rights letter dated January 10, 2020. *See* Morrison Decl., Exh. 8 (the "Indemnification Notice").

23.     Not only does the disposition of this action affect the amount of the Prepetition ABL Secured Parties' secured claim against the Debtors (which itself directly affects the Debtors' cases and distributions available to other creditors), but it also directly affects the Debtors' ability to use cash collateral pursuant to the Financing Order and the Approved Budget attached thereto. As set forth in the Approved Budget, prior to the filing of the MidCap Complaint and the assertion of the indemnification obligations set forth in the Indemnification Notice, the Debtors anticipated that the Prepetition ABL Obligations (other than the indemnification obligations that have been asserted as a result of the Complaint) would be paid in full in cash in approximately

three weeks from now.  Thereafter, the Financing Order provides (and the Approved Budget anticipates) that the Debtors would be able to use all cash collateral coming into the Debtors' possession or control to fund (in part) the administration of the Debtors' cases.  As a result of the contingent indemnification obligations arising from the filing of the MidCap Complaint and the claims and causes of action asserted against the Prepetition ABL Secured Parties, the Debtors must continue to remit cash collateral to the Prepetition ABL Agent to secure such contingent, asserted, indemnification obligations and the Debtors will not have access to that cash collateral to fund their cases until the amount asserted in the MidCap Complaint is fully cash collateralized or the claims asserted in the MidCap Complaint are adjudicated.  Further, Plaintiff's claims against Prepetition ABL Agent unquestionably challenge Prepetition ABL Secured Parties' prepetition debt and the Prepetition ABL Agent's liens, and also affect any distributions made to the Debtors' creditors.

24.    For all of these reasons, and those articulated by the Third Circuit in *Pacor*, at a minimum, the allegations in the MidCap Complaint make clear that the relationship between this action and the Debtors' bankruptcy proceedings raises claims that are "related to" the Debtors' bankruptcy proceedings, as those claims and the disposition of the action will have a direct impact on the Debtors' estates and their creditors.

25.    Accordingly, this action is "related to" the Debtors' bankruptcy proceedings, and removal to this Court is therefore appropriate under 28 U.S.C. § 1334(b).  *See also* Debtors' Removal Petition at ¶¶ 6-9.

26.    To the extent this action is a non-core proceeding under "related to" jurisdiction, Defendant consents to entry of final orders or judgments by the Bankruptcy Court.

27.     While Defendant denies that Plaintiff's claims have any merit, it nevertheless reserves the right to raise all defenses and objections to the action after it is removed to the Bankruptcy Court.

### B. This Case "Arises In" The Debtors' Bankruptcy Proceedings

28.     As a result of the underlying dispute regarding, and need for determination of, the ownership of the $6.2 million at issue (as noted in the Debtors' Removal Petition), this Court also has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1334(b) and 1452(a).   This Case is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (K), and (O).   *See also* Debtors' Removal Petition at ¶¶ 10-11.   Core proceedings "arise in" or "arise under" title 11 cases for purposes of 28 U.S.C. § 1334(b). *See* 28 U.S.C. § 157(b)(1) ("Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11").

29.     The resolution of a similar dispute over property of the estate can be found in the Ames Department Store bankruptcy case.   *See LFD Operating Inc. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.)*, 274 B.R. 600 (S.D.N.Y. Bankr. 2002), *aff'd* No. 02-cv-6271 (SHS), 01-42217 (REG), 01-8139A (AJG), 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd* No. 04-5304, 2005 WL 1916360 (2d Cir. Aug. 10, 2005); *LFD Operating Inc. v. Gen. Elec. Capital Corp. (In re Ames Dept. Stores, Inc.)*, No. 06-cv-5394 (BSJ)(THK), 2008 WL 7542200 (S.D.N.Y. June 4, 2008).   There, plaintiff LFD commenced an adversary proceeding against the debtor Ames "to compel Ames to turn over to LFD $8.9 million LFD claimed it was due pursuant to a contract."   2004 WL 1948754, at *1 (the "LFD-Ames Action").   LFD contended that Ames failed to pay money from the sale of LFD's merchandise allegedly held in trust by

Case 20-50430-KBO    Doc 1    Filed 01/23/20    Page 12 of 17

Ames and due LFD, and instead such funds were paid to Ames's secured lenders, including GE Capital, when they swept funds according to terms of a prepetition, revolver credit agreement.

30.     Simultaneously, LFD filed an action against GE Capital (the "LFD-GE Capital Action") in state court predicated on the same facts as the LFD-Ames Action, alleging that GE Capital's receipt of funds from Ames under terms of the revolver was the receipt of LFD's sales proceeds.  *See* 2008 WL 7542200, at *1.  GE Capital removed the LFD-GE Capital Action to bankruptcy court, asserting that the action was a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), (E), (G), (K), and (O).  *Id*. at *2.  GE Capital also consented to the entry of final orders or judgment by the bankruptcy court if the action was deemed non-core.

31.     On appeal of the LFD-GE Capital Action to the district court, the court concluded that the LFD-GE Capital Action was core because "the issue in both the LDF-Ames [Action] and the [LFD-GE Capital Action] is a determination of the property of the estate intricately involved in the pre- and post-petition financing of the debtor."  *Id*. at *6.

32.     Likewise, here the Bankruptcy Court must determine in the first instance whether the $6.2 million at issue in this action, the Verified Celadon Complaint and Debtors' bankruptcy cases is Plaintiff's property or instead is property of the estates.  As noted above, as a result of the Debtors' indemnification obligations as described in the Indemnification Notice, this determination directly implicates the Defendant's secured claim, the DIP financing and the cash collateral that is available to fund the debtors' cases.  Any decision by the court on the merits of the MidCap Complaint will necessarily affect the rights and obligations of the Debtors and the administration of the estates.

33.     The LFD-Ames and LFD-GE Capital actions also weigh heavily on the merits of this matter and further demonstrate why removal and immediate resolution of this matter before

the bankruptcy court is so vital. There, the bankruptcy court first resolved the LFD-Ames Action

(the claims brought against the debtor). In so doing, the bankruptcy court analyzed the parties'

rights to the disputed funds, finding that "[t]he inquiry begins with the interpretation of the use of

the word 'property' in paragraph 41 of the Agreement. Here, Ames has collected the Net Sales

Proceeds and commingled the funds in its depository accounts and used the funds in an

unrestricted manner. … As a general rule, once funds are deposited in a bank account, the

account holder is presumed to have title to and control over those funds." 274 B.R. at 616-17

(citing *United States v. $79,000 in Account Number 2168050/6749900*, No. 96-cv-3493, 1996

WL 648934(MBM), at *4 (S.D.N.Y. Nov. 7, 1996)).

34.    Analyzing the underlying agreement between LFD and Ames further, the

bankruptcy court made three key findings:

> First, it is undisputed that the Agreement contained no provision that required that
> Ames place the Net Sales Proceeds in a segregated bank account. To the contrary,
> the Agreement requires that the proceeds be processed through the regular
> channels of Ames's business and, as discussed below, Ames has no restriction on
> the use of those proceeds. The discretionary element of determining the regular
> channels of Ames's business has, in practice, resulted in Ames commingling the
> Net Sales Proceeds in Ames's depository accounts with proceeds from non-
> Baker/LFD merchandise. LFD, therefore, has no control or right to control how
> the proceeds are processed by Ames and where the Net Sales Proceeds are
> ultimately deposited. Courts have found that the absence of a segregation of funds
> is inconsistent with an agency relationship.

*Id*. at 620 (citing *Welding Metals, Inc. v. Foothill Capital Corp.*, No. 3:92-cv-00607 (WWE),

1997 WL 289671, at *8 (D. Conn. Apr. 14, 1997)).

> Second, once the Net Sales Proceeds were placed in Ames's depository accounts,
> LFD had no control over when and how Ames directed and used those funds. It is
> undisputed that Ames used the proceeds from the sale of LFD merchandise to pay
> Ames's Secured Lenders by placing those funds in the Blocked Accounts that
> were swept by GECC. It is self-evident that Ames could just have easily used
> those funds for any other corporate purpose—such as purchasing inventory,
> paying salaries, etc. Because LFD had no right to alter or direct any aspect of this
> process under the Agreement, LFD had no control over the use of the Net Sales
> Proceeds once the funds were placed in Ames's cash management system. The

Court finds that this element is inconsistent with the control necessary for an
agency relationship.

*Id*. at 621.

> Finally, the amounts Ames actually paid to LFD every week, cannot be traced
> back to the precise funds Ames received from the sales of LFD's merchandise.
> Through Ames's cash management system, Ames used the proceeds from the sale
> of LFD merchandise to pay Ames's Secured Lenders by placing those funds in the
> Blocked Accounts that were swept by GECC. All payments made by Ames are
> made from a Disbursement Account. The funds made available in Ames's
> Disbursement Account are not the same monies from the sale of LFD
> merchandise. Ames's Disbursement Account is a blocked account funded
> exclusively through advances provided by GECC. Ames wires LFD weekly for
> payment of LFD merchandise sold in Ames's stores from general funds made
> available by GECC in Ames's Disbursement Account. Thus, Ames's obligation to
> LFD was satisfied by a payment from its Disbursement Account and there was no
> expectation or requirement that the actual proceeds from the sale of LFD
> merchandise be paid to LFD, less Ames's commission. This Court finds that this
> element is inconsistent with the fiduciary relationship necessary between principal
> and agent.

*Id*.

35.     Thus, the bankruptcy court found that the only relationship between LFD and
Ames was a debtor-creditor relationship.  *Id*. at 623 ("It is firmly established that if a recipient of
funds is not prohibited from using the funds as his own and the recipient is not prohibited from
commingling the funds with his own monies, a debtor-creditor relationship, not a trust
relationship, exists.") (internal citations omitted).  *See also* 2008 WL 7542200, at *2
(summarizing the bankruptcy court's holdings as "(1) that the proceeds from the sale of LFD
merchandise were the property of Ames, (2) that GECC had the right to receive the Proceeds
from Ames, [and] (3) that LFD's agreement with Ames gave LFD no superior right to the
Proceeds, no right of immediate possession of the proceeds, and no ownership interest in the
Proceeds.")

36.     This holding also was, in turn, dispositive of the LFD-GE Capital Action.  The
bankruptcy court dismissed the claims in the LFD-GE Capital Action with prejudice on the

grounds of collateral estoppel based on the bankruptcy court's rulings in the LFD-Ames Action. *See* 2008 WL 7542200, at \*\*1, 9-11.  The district court then affirmed "the Bankruptcy Court's conclusion that LFD is collaterally estopped from litigating that the Proceeds 'belonged to' it." *Id.* at \*11.

37.    This Court should be guided by the *In re Ames* cases and ensure that it immediately resolves the dispute as to whether the same $6.2 million that is at issue in the bankruptcy cases, the Verified Celadon Complaint and this action can be considered to be Plaintiff's property.  In so ruling, this Court need only look to: (i) the plain language of the Transaction Documents to determine that no segregation of any amounts allegedly owned by or owing to the Plaintiff was required (and based on the statements included in the Plaintiff's Verified Celadon Complaint, no such segregation occurred), (ii) the Debtors' cash management system to determine that any funds received by the Debtors were commingled in the Debtors' general operating accounts, and (iii) the Debtors' agreements and obligations set forth in the Prepetition ABL Credit Agreement to determine the Prepetition ABL Secured Parties' rights to receive funds deposited into lockbox accounts on a daily basis.  If this Court agrees that the $6.2 million is not the Plaintiff's property, then that ruling should conclude all issues relating to the $6.2 million as it concerns the bankruptcy cases, the Verified Celadon Action and this action. The Plaintiff's attempt to elevate its unsecured claim against the Debtors by filing the MidCap Complaint is transparent as a result of, among other things, inconsistent statements made in the Verified Celadon Complaint as compared to the MidCap Complaint – *i.e.*, the Plaintiff states in the Verified Celadon Complaint that the "Defendants have spent most, if not all, of the Accounts Receivable and CSA Proceeds in their possession," Morrison Decl. Exh. 2 at ¶ 17, and used the "funds to run their business operations…." *id.* at ¶ 1, yet then somehow states in the MidCap

Complaint that the Debtors had no access to such funds and the Defendant was accordingly unjustly enriched.  MidCap Complaint, ¶¶ 11-17.  Such statements cannot be reconciled and evidence a blatant attempt to collect from the Defendant what it cannot collect from the Debtors on account of what amounts to an unsecured claim.

38.    Pursuant to Rule 9027-1(a) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Defendant consents to the entry of a final judgment or order with respect to this Notice of Removal.

## CONCLUSION

WHEREFORE, Defendant MidCap Funding IV Trust hereby removes this action from the Superior Court of the State of Delaware to the United States Bankruptcy Court for the District of Delaware as an adversary proceeding in the Debtors' bankruptcy proceedings therein.

Dated:  January 23, 2020                     Respectfully submitted,


*/s/ Eric D. Schwartz*
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Thomas W. Briggs, Jr. (No. 4076)
Barnaby Grzaslewicz (No. 6037)
Page N. Topper (No. 6470)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
eschwartz@mnat.com
mharvey@mnat.com
tbriggs@mnat.com
bgrzaslewicz@mnat.com
ptopper@mnat.com

-and-

David E. Morrison
Danielle D. Juhle

GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
Telephone:  (312) 201-4000
Facsimile:  (312) 332-2196
david.morrison@goldbergkohn.com
danielle.juhle@goldbergkohn.com