Exhibit A

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| TA DISPATCH, LLC, an Alabama limited liability company, | |
| Plaintiff, | C.A. No. _____ |
| v. | **FILED UNDER SEAL** |
| MIDCAP FUNDING IV TRUST, a Delaware statutory trust, | **Jury of Twelve Demanded** |
| Defendant. | |

**COMPLAINT**

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE SUPERIOR COURT OF THE STATE OF DELAWARE.**

**If you are not authorized by Court Order to view or retrieve this document, read no further than this page. You should contact the following person(s):**

Brian M. Rostocki
Benjamin P. Chapple
Justin M. Forcier
Alexandria P. Murphy
REED SMITH LLP
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500

A public version will be filed on or before February 5, 2020

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| TA DISPATCH, LLC, an Alabama limited liability company,<br><br>       Plaintiff,<br><br>  v.<br><br>MIDCAP FUNDING IV TRUST, a Delaware statutory trust,<br><br>       Defendant. | C.A. No. _____<br><br><br>**<u>FILED UNDER SEAL</u>**<br><br>**<u>Jury of Twelve Demanded</u>** |

## <u>COMPLAINT</u>

Plaintiff TA Dispatch, LLC ("Plaintiff") brings this action against Defendant Midcap Funding IV Trust ("Defendant") for tortious interference with contract, unjust enrichment, and declaratory judgment. Upon personal knowledge with respect to itself and otherwise on information and belief, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this action because Defendant improperly (i) interfered with Plaintiff's contractual rights under agreements with third-parties and (ii) refuses to remit to Plaintiff approximately $6.2 million of funds earmarked for, and belonging solely to, Plaintiff after Defendant improperly "swept" these funds from the bank accounts of companies that were required to hold Plaintiff's money.

2.    Defendant's tortious interference with contract and improper retention of Plaintiff's earmarked funds arises from Plaintiff's entry into an Asset Purchase

1

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Agreement, effective April 1, 2019 (the "APA"), with subsidiaries of Celadon Group, Inc. ("Celadon Parent")—Celadon Trucking Services Inc., Celadon Logistics Services Inc., and Hyndman Transport Limited (collectively, the "Celadon Subsidiaries" and with Celadon Parent, the "Celadon Companies").

3.      Under the APA, the Celadon Subsidiaries sold to Plaintiff the rights, operations, and assets associated with a transportation-logistics and brokerage-services business that offers freight consolidation, freight forwarding, transportation management, and value-added warehousing (the "Purchased Assets").

4.      In addition to the APA, Plaintiff and the Celadon Companies entered into a number of ancillary agreements to facilitate the transition of operations from the Celadon Subsidiaries to Plaintiff.  These include, but are not limited to, a Capacity Solutions Agreement/Denver LTL Agreement (the "CSA"), Co-Broker Agreement, and various Agency Agreements between Plaintiff and certain of the Celadon Companies (with the APA, Co-Broker Agreement, and CSA, the "Transaction Documents").

5.      Under the CSA, Co-Broker Agreement, and Agency Agreements, Celadon Trucking Services Inc. and Celadon Logistics Services Inc. agreed that certain freight loads tendered by customers to the Celadon Companies would be transferred to Plaintiff to: (a) broker to a third-party carrier under the brokerage

2
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

authorities of Celadon Trucking Services Inc. and Celadon Logistics Services Inc.; or (b) broker to a third-party carrier under the brokerage authority of Plaintiff.

6.      Under the Co-Broker Agreement, Celadon Trucking Services Inc. and Celadon Logistics Services Inc. would broker certain shipments to Plaintiff pursuant to their DOT brokerage authorities,[1] and Plaintiff would then broker the shipments to the transporting carriers pursuant to Plaintiff's DOT brokerage authority.  In this scenario, Plaintiff would directly contract with the transporting carriers.

7.      Under the Agency Agreements, Celadon Trucking Services Inc. and Celadon Logistics Services Inc. would tender shipments to Plaintiff and Plaintiff would broker the freight to the transporting carriers pursuant to Celadon Trucking Services Inc. and Celadon Logistics Services Inc.'s DOT brokerage authorities.  In this scenario, Plaintiff would utilize Celadon Trucking Services Inc. and Celadon Logistics Services Inc.'s contracts with the transporting carriers.

8.      Under the Co-Broker Agreement and Agency Agreements, Plaintiff was obligated to pay the transporting carriers and did so on all occasions.

9.      Because Plaintiff is not a motor carrier, Plaintiff had two options under the CSA, Co-Broker Agreement, and Agency Agreements: (i) find a transporting

---

[1] DOT brokerage authority is required by the Federal Motor Carrier Safety Administration for companies that arrange for the transportation of freight by carriers in interstate commerce.  The Federal Motor Carrier Safety Administration is the government agency that regulates the trucking industry.

THE DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

carrier; or (ii) turn the load down. However, the latter was not a real option because Plaintiff was obligated to accept the loads under the terms of the CSA.

10.    For certain of the customer loads under the Transaction Documents, Celadon Trucking Services Inc. and/or Celadon Logistics Services Inc. handled the customer billing and invoicing, despite the fact that Plaintiff performed the transportation-related services for those loads and paid the transporting carriers (the "Indirect CSA Loads").

11.    Under the Transaction Documents, amounts billed and received from customers related to the Indirect CSA Loads (the "CSA Proceeds") were supposed to be held at all times for Plaintiff's benefit.

12.    Likewise, under the APA, Co-Broker, and Agency Agreements, Plaintiff appointed Celadon Logistics Services Inc. and Celadon Trucking Services Inc. as its agents for the purpose of collecting designated accounts receivable (the "Designated Receivables") on behalf of Plaintiff.  Additionally, certain third-parties inadvertently remitted to the Celadon Companies payment of accounts receivable owned by Plaintiff that should have been remitted directly to Plaintiff, as the new owner of the Purchased Assets (the "Inadvertent Receivables," with the Designated Receivables, the "Accounts Receivable").

13.    Defendant, in its capacity as a lender to Celadon Parent, has improperly (and repeatedly) "swept" the Accounts Receivables and CSA Proceeds from the

4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Celadon Companies' bank accounts (the "Swept Funds") after closing on the loan on July 31, 2019 and when the Celadon Companies started facing significant financial issues. Although Defendant may have a contractual right to sweep funds owned by the Celadon Companies, Defendant does not have any right to sweep, and thereby misappropriate, Plaintiff's Accounts Receivables and CSA Proceeds held by the Celadon Companies. It was similarly improper for Defendant to impede the payment of the Accounts Receivable and CSA Proceeds to Plaintiff from the Celadon Companies.

14.    Both the Accounts Receivable and CSA Proceeds were at all times to be specifically earmarked and held for Plaintiff's benefit because they were never the property of Defendant or any of the Celadon Companies.

15.    In connection with the Celadon Companies recently filing for Chapter 11 bankruptcy, the bankruptcy court entered an Order on December 10, 2019 holding the Account Receivables and CSA Proceeds are not property of the bankruptcy estate, recognizing the funds are Plaintiff's property. Indeed, under this Order, payment has been made to Plaintiff for Account Receivables and CSA Proceeds received after the bankruptcy filing.

16.    Defendant's sweeping, and thereby misappropriating, the funds, as well as impeding the payment of the funds to Plaintiff, constitute tortious interference with the Transaction Documents. At all relevant times, Defendant has been aware

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

of the Celadon Companies' obligations under the Transaction Documents to remit to Plaintiff the Accounts Receivables and CSA Proceeds.  In connection with its commercial relationship with the Celadon Companies, Defendant conducted due diligence and audits of the Celadon Companies' records that provided Defendant with actual notice the Account Receivables and CSA Proceeds it elected to sweep were solely Plaintiff's property, not property of the Celadon Companies.

17.    Without justification, Defendant knowingly interfered with the Celadon Companies' ability to satisfy their contractual obligations to Plaintiff, which correspondingly harmed Plaintiff, by sweeping and misappropriating the Account Receivables and CSA Proceeds with knowledge those funds are Plaintiff's property. Defendant also never ensured the Account Receivables and CSA Proceeds were earmarked for Plaintiff or remitted to Plaintiff by the Celadon Companies.

18.    Plaintiff seeks (i) an Order from the Court finding the Swept Funds are Plaintiff's property, (ii) an award of monetary damages sustained, or restitution, as a result of Defendant improperly sweeping and retaining the Swept Funds, and (iii) awarding Plaintiff all relief deemed appropriate by the Court, including pre- and post-judgment interest and all fees and costs associated with this action.

## PARTIES

19.    Plaintiff TA Dispatch, LLC is an Alabama limited liability company, with a principal place of business in Ensley, Alabama.  Plaintiff is in the business of

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

providing customers a wide range of trucking and transportation management services in third-party logistics, full-service brokerage, and on-site materials handling and warehousing.

20.    Defendant Midcap Funding IV Trust is a Delaware statutory trust with a principal place of business in Bethesda, Maryland.  Defendant is in the business of, among other things, providing asset-based lending.

## JURISDICTION AND VENUE

21.    Jurisdiction and venue exists under 10 *Del. C.* § 541.

22.    Defendant is subject to jurisdiction under 12 *Del. C.* § 3804 because Defendant is a statutory trust formed under the laws of the State of Delaware.

## FACTUAL BACKGROUND

**A.    Plaintiff And The Celadon Subsidiaries Enter Into The Transaction Documents**

23.    On April 15, 2019, Plaintiff and the Celadon Subsidiaries entered into the Asset Purchase Agreement (defined above as the "APA"), Capacity Services Agreement (defined above as the "CSA"), Co-Broker Agreement, and Agency Agreements (collectively defined above as the "Transaction Documents").  The APA was effective April 1, 2019.  The APA is attached as Exhibit A, Agency Agreements are attached as Exhibit B, CSA is attached as Exhibit C, and Co-Broker Agreement is attached as Exhibit D.

7

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

24.     The APA provides for the sale of substantially all of the assets of the business of Defendant Celadon Logistics, along with certain ancillary assets from Celadon Trucking Services, Inc. and Hyndman Transport Limited (defined above as the "Purchased Assets").  *See* Ex. A § 1.01.

25.     The APA expressly provides the Purchased Assets include "all of the [the Celadon Companies'] rights, title and interests" under various contracts and other assets enumerated on Schedules 1.01(a), 1.01(b), and 1.01(c) of the APA.  *See* Ex. A § 1.01(a)-(c).  Plaintiff acquired all accounts receivable due and payable to the Celadon Companies in connection with those acquired contracts (collectively, the "Purchased A/R").  *Id.*

26.     In the APA, the parties acknowledged the Celadon Companies may receive certain amounts of the Purchased A/R under contracts that were sold as part of the Purchased Assets.

27.     Under the APA, as well as Agency and Co-Broker Agreements entered into on the same date, Plaintiff appointed Celadon Logistics Services Inc. and Celadon Trucking Services Inc. as its agents for the purpose of collecting designated Purchased A/R on behalf of Plaintiff (defined above as the "Designated Receivables").

28.     Additionally, certain third-parties inadvertently remitted to the Celadon Companies payment of accounts receivable owned by Plaintiff that should have been

8

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

remitted directly to Plaintiff, as the new owner of the Purchased Assets (defined above as the "Inadvertent Receivables," with the Designated Receivables, the "Accounts Receivable").

29.    Because the Purchased A/R is owned by Plaintiff, the Celadon Subsidiaries (as Sellers) and Plaintiff (as Buyer) acknowledged and agreed in Section 4.05 of the APA that the Celadon Companies would promptly remit to Plaintiff the Purchased A/R, including the Accounts Receivable:

> <u>Receivables and Other Payments</u>.  From and after Closing, if Sellers or any of their Affiliates receive or collect any funds relating to any accounts receivable that are included in the Purchased Assets or any other Purchased Asset, Sellers or their Affiliate shall remit such funds to Buyer within (5) Business Days after its receipts thereof.

*See* Ex. A § 4.05.

30.    The APA discusses and incorporates the CSA, Co-Broker Agreement and Agency Agreements, under which the parties agreed that certain freight loads tendered by a customer to the Celadon Companies would then be transferred to Plaintiff to broker to a third-party carrier under Celadon Trucking Services Inc.'s and Celadon Logistics Services Inc.'s brokerage authority or Plaintiff's brokerage authority:

> <u>Capacity Solutions</u>.  With respect to any load that is tendered by a customer into the Celadon AS400, transferred into Mercury Gate/Logistics system, and covered by a third-party carrier ("<u>Capacity Solutions</u>"), the terms and conditions set forth in the CSA … will apply.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*See* Ex. A § 4.03; *see also* Ex. C § 1.01(b).

31.     Under the CSA, Co-Broker Agreement and Agency Agreements, Celadon Trucking Services Inc. and Celadon Logistics Services Inc. agreed that certain freight loads tendered by customers to the Celadon Companies would be transferred to Plaintiff to broker to a third-party carrier (directly under the Co-Broker agreement or indirectly under the Agency Agreements).

32.     For certain of these customer loads, Celadon Trucking Services Inc. and/or Celadon Logistics Services Inc. handled the customer billing and invoicing, despite the fact that Plaintiff performed the transportation-related services for those loads and paid the transporting carriers (defined above as the "Indirect CSA Loads").

33.     For all Indirect CSA Loads fulfilled by Plaintiff, the CSA provides Plaintiff will invoice the Celadon Companies, who are then obligated to remit payment to Plaintiff within fifty days of receipt of such invoice (defined above as "CSA Proceeds").  *See* Ex. C § 1.03.

34.     The CSA Proceeds are Plaintiff's property, received by the Celadon Companies for Plaintiff's sole benefit.

35.     Under terms of the Co-Broker Agreement, all revenue billed for the brokerage of third-party loads is the property of Plaintiff:

> [Plaintiff] shall be paid and/or entitled to all gross revenue billed to Customers for shipments arranged pursuant to or in accordance with this Agreement.  Such revenue shall be for the benefit of [Plaintiff],

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

regardless of whether billed or received by [Plaintiff] or [Celadon Trucking Services, Inc. and Celadon Logistics Services, Inc.]

*See* Ex. D, Appendix A

36.    Appendix A to  the Agency Agreements further demonstrates that all revenue billed in accordance with the Agency Agreements is "for the benefit" of Plaintiff, and all payments are due to Plaintiff within 50 days of invoicing:

> Subject to the terms and conditions in the CSA, [Plaintiff] shall be paid and entitled to all gross revenue billed to Customers for Shipments arranged pursuant to or in accordance with this Agreement.  Such revenue shall be for the benefit [Plaintiff], regardless of whether billed or received by [Celadon Trucking Services, Inc., Celadon Logistics Services, Inc.] or [Plaintiff].

> All payments due [to Plaintiff] shall be payable within 50 days of invoice.

*See* Ex. B, Appendix A.

### B.    The Celadon Companies Stop Remitting The Accounts Receivable And CSA Proceeds To Plaintiff, As Required, After The Celadon Companies Experience Liquidity Issues

37.    On or about November 13, 2019, the Celadon Companies advised that they were experiencing significant financial issues, including a liquidity crisis.

38.    The Celadon Companies initially remitted to Plaintiff the Accounts Receivable and CSA Proceeds in accordance with the Transaction Documents. However, on or about August 6, 2019, the Celadon Companies began delaying payment and failing to remit the full amount due.  More recently, the Celadon Companies ceased remitting the Accounts Receivable and CSA Proceeds.  The

11

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Celadon Companies failed to make these payments to Plaintiff because they began using Plaintiff's funds to prop up their business operations in an attempt to avoid (or at least better position themselves for) bankruptcy.

39.    As detailed in a lawsuit Plaintiff filed against the Celadon Companies in the Delaware Court of Chancery on December 2, 2019 (C.A. No. 2019-0960-SG), the Celadon Companies do not dispute the CSA Proceeds and Accounts Receivables are required to be remitted to Plaintiff.

40.    As of December 2, 2019, the Celadon Companies had collected $1,780,571 in Accounts Receivable owned by, and earmarked for, Plaintiff that the Celadon Companies did not remit to Plaintiff.

41.    As of November 25, 2019, the Celadon Companies had collected, on Plaintiff's behalf, for Indirect CSA Loads $4,390,769 of CSA Proceeds owned by, and earmarked for, Plaintiff that the Celadon Companies did not remit to Plaintiff.

**C.    Defendant "Sweeps" The Celadon Companies Bank Accounts And Knowingly (And Improperly) Includes Plaintiff's Accounts Receivable And CSA Proceeds Held In The Bank Accounts**

42.    Defendant is one of the Celadon Companies largest lenders, if not the largest, and Defendant has a security interest in the Celadon Companies' cash collateral.

43.    In accordance with its lending agreements between Defendant and the Celadon Companies, Defendant's security interest in the Celadon Companies' cash

12

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

collateral entitles Defendant to "sweep" funds from the Celadon Companies' bank accounts and deposit the swept funds into Defendant's bank accounts.

44.    However, Defendant is not entitled to sweep funds owned by other parties, such as Plaintiff, that are held in the Celadon Companies' bank accounts.

45.    Between approximately August 5, 2019 and December 13, 2019, on almost a daily basis, Defendant swept from the Celadon Companies bank accounts approximately $23.6 million of funds, including Plaintiff's Accounts Receivable and CSA Proceeds.

46.    At all relevant times, including each time Defendant swept Plaintiff's Account Receivables and CSA Proceeds, Defendant was aware the Account Receivables and CSA Proceeds are Plaintiff's property.

47.    As part of its due diligence efforts in mid-July 2019 prior to entering into the lending relationship with the Celadon Companies, as well as part of its field exam audit of the Celadon Companies in October 2019 after entering into the lending relationship, Defendant was put on notice regarding the approximate amount of funds that Defendant could reasonably expected to be available in the Celadon Companies' bank accounts for sweeping, if necessary.  From its due diligence and field exam audit, Defendant knew of the contractual relationship between Plaintiff and the Celadon Companies, as well as the approximate amounts of the Accounts Receivable and CSA Proceeds that were earmarked as Plaintiff's property.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

48.    Defendant swept funds belonging to Plaintiff when Defendant initiated the daily cash sweeps on the Celadon Companies' bank accounts after the July 31, 2019 loan closing.  This corresponds with the time period in which the Celadon Companies began to short (or not) pay Plaintiff for monies it owed Plaintiff for the Accounts Receivables and CSA Proceeds.

49.    The amount of Account Receivables and CSA Proceeds in the Celadon Companies' bank account (prior to being swept by Defendant) was so significant that it alerted, or at least should have alerted, Defendant that a large amount of funds held in the Celadon Companies' bank accounts is not property of the Celadon Companies.

50.    Despite Defendant's actual knowledge that the Swept Funds are owned by Plaintiff, Defendant proceeded to sweep Plaintiff's Account Receivables and CSA Proceeds from the Celadon Companies' bank accounts on almost a daily basis.

51.    To date, Defendant swept from the Celadon Companies bank accounts approximately $23.6 million of Plaintiff's Accounts Receivable and CSA Proceeds.

**D.    The Celadon Companies File For Bankruptcy**

52.    The Celadon Companies, among other affiliates of Celadon Parent, filed for Chapter 11 bankruptcy on December 8, 2019.

53.    On December 10, 2019, in connection with "first day" proceedings, the bankruptcy court presiding over the Celadon Companies' bankruptcy entered an

14

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Order (the "First Day Order") (i) finding the Account Receivables and CSA Proceeds are Plaintiff's property, (ii) requiring the Celadon Companies to segregate the Account Receivables and CSA Proceeds, and (iii) requiring any Account Receivables [and/or CSA Proceeds] in the possession of the Celadon Entities to be remitted to Plaintiff:

> The Debtors [including the Celadon Companies] collect certain receivables on behalf of [Plaintiff] (the "TA Dispatch Receivables"). *The TA Dispatch Receivables are not property of the Debtors' Estates*. Upon receipt from the Prepetition ABL Agent of proceeds of TA Dispatch Receivables, on a Cash Collateral Remittance Date, the *Debtors will segregate such TA Dispatch Receivables and remit them to [Plaintiff]* on a weekly basis beginning the week of December 15, 2019 within one (1) Business Day of each Cash Collateral Remittance Date.

*See* First Day Order, attached hereto as Exhibit E, §3.4.

54.    Defendant participated in the first-day proceedings that led to the bankruptcy court entering the First Day Order.

55.    In connection with the bankruptcy proceedings, Defendant did not object to the bankruptcy court finding the Accounts Receivables and CSA Proceeds are not property of the Celadon Companies.  Nor did Defendant object to the bankruptcy court requiring, through the First Day Order, the Celadon Companies to segregate and remit to Plaintiff the Accounts Receivables and CSA Proceeds.

56.    On or about December 19, following an accounting and receipt of funds from Defendant, the Celadon Companies made a payment to Plaintiff in the amount

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

of $602,680 for the Accounts Receivable and CSA Proceeds received after the bankruptcy filing.

57.    Defendant has not (and cannot) offer any credible basis to distinguish between, on the one hand, Account Receivables and CSA Proceeds owed to Plaintiff prior to the Celadon Companies filing for bankruptcy and, on the other hand, Account Receivables and CSA Proceeds owed to Plaintiff following the bankruptcy filing.

58.    Although Defendant has agreed to comply with the First Day Order, Defendant has refused to remit to Plaintiff the Accounts Receivables and CSA Proceeds it improperly swept prior to the Celadon Companies filing for bankruptcy. To date, Defendant has refused to remit those funds to Plaintiff.

## COUNT I
### (Tortious Interference With Contract)

59.    Plaintiff incorporates and restates each allegation above as if fully set forth below.

60.    The Transaction Documents are each enforceable contracts between the parties, and Plaintiff has complied with all condition precedents applicable to it under the contracts.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

61.    Defendant was at all relevant times aware of the Transaction Documents, as well as the obligations due and owing to Plaintiff under those contracts.

62.    By engaging in the conduct described in detail above, Defendant intentionally interfered with the Transaction Documents, including the Celadon Companies' performance of their obligation to remit to Plaintiff the Accounts Receivable and CSA Proceeds.

63.    Defendant's actions in sweeping and misappropriating the Swept Funds—which were held by the Celadon Companies for Plaintiff's sole benefit—were without justification.

64.    At all relevant times, Defendant was fully aware the Swept Funds did not belong to the Celadon Companies, were fully aware the Transaction Documents required the Celadon Companies to remit the Account Receivables and CSA Proceeds constituting the Swept Funds to Plaintiff, and were fully aware that by misappropriating the Swept Funds, the Celadon Companies would be unable to comply with their obligations to Plaintiff in light of the financial distress the Celadon Companies were experiencing.

65.    By misappropriating the Swept Funds in a manner that prevented the Celadon Companies from complying with their obligations to remit the funds to Plaintiff, Defendant caused financial harm to Plaintiff, including, but not limited to,

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

depriving Plaintiff of at least $1.8 million in Account Receivables and $4.4 million in CSA Proceeds.

## **COUNT II**
### **(Unjust Enrichment)**

66.     Plaintiff incorporates and restates each allegation above as if fully set forth below.

67.     Defendant knew the Celadon Companies' bank accounts Defendant swept includes Account Receivables and CSA Proceeds owned by Plaintiff, not the Celadon Companies.

68.     Defendant does not have an economic interest in Plaintiff's Accounts Receivable or CSA Proceeds and, therefore, Defendant should not have collected the Swept Funds.

69.     Plaintiff did not benefit in any way from Defendant's failure to remit to Plaintiff the Swept Funds, Accounts Receivable and/or CSA Proceeds.

70.     Plaintiff, however, enriched Defendant by entering into the Transaction Documents with the Celadon Companies because, as a consequence of the Plaintiff's entry into the Transaction Documents, Plaintiff designated the Celadon Companies to receive certain funds that were deposited into the Celadon Companies bank accounts before the Defendant wrongfully obtained the Swept Funds.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

71.    Defendant has been unjustly enriched by its receipt and retention of the Swept Funds, and Plaintiff has been correspondingly deprived of those Swept Funds.

72.    Defendant has failed to make restitution to Plaintiff for the benefit that Plaintiff conferred upon Defendant.

73.    Defendant would be unjustly enriched if it were not required to remit the Swept Funds (plus interest) to Plaintiff.

74.    In good conscience and justice, Defendant should not be entitled to retain the windfall or economic benefits that would be conferred upon Defendant due to Defendant sweeping the Celadon Companies' bank accounts to obtain the Account Receivables and CSA Proceeds.

**COUNT III**
**(Declaratory Judgment)**

75.    Plaintiff incorporates and restates each allegation above as if fully set forth below.

76.    Under the APA, Co-Broker Agreement and Agency Agreements, Plaintiff appointed Celadon Logistics Services Inc. and Celadon Trucking Services Inc. as its agents for the purpose of collecting the Accounts Receivable.

77.    The CSA Proceeds and Accounts Receivable were held by the Celadon Companies for the benefit of Plaintiff.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

78.    Defendant, in its capacity as a lender to Celadon Parent, misappropriated the Swept Funds and has refused to return those funds to Plaintiff.

79.    There is a judiciable controversy because the Swept Funds are Plaintiff's property and Defendant has refused to return the Swept Funds to Plaintiff.

80.    Plaintiff is entitled to a declaratory judgment that the Swept Funds are Plaintiff's property under the CSA, APA, Co-Broker and Agency Agreements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays a judgment in its favor and against Defendant, and Plaintiff prays for relief as follows:

A.    Monetary damages caused by Defendant's tortious interference with the Transaction Documents and unlawful possession of the Swept Funds;

B.    Restitution of the Swept Funds;

C.    A declaration that the Swept Funds are the property of Plaintiff;

D.    Pre- and post-judgment interest;

E.    Plaintiff's attorneys' fees and costs incurred in connection with this action;

F.    This action be decided by a jury of 12; and

G.    Such other relief the Court deems just and proper.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Date:  January 6, 2020

Respectfully submitted,

REED SMITH LLP

*/s/ Brian M. Rostocki*
Brian M. Rostocki (No. 4599)
Benjamin P. Chapple (No. 5871)
Justin M. Forcier (No. 6155)
Alexandria P. Murphy (No. 6686)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500

*Counsel for Plaintiff*

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# Exhibit A

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# Exhibit B

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# Exhibit C

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# Exhibit D

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.