## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| CELADON GROUP, INC., et al., | ) | Case No. 19-12606 (KBO) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |
| TA DISPATCH, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | Adversary Case No. 20-50430 (KBO) |
| | ) | |
| MIDCAP FUNDING IV TRUST, | ) | |
| | ) | |
| Defendant. | ) | |

### BRIEF IN SUPPORT OF MIDCAP FUNDING IV TRUST'S
### MOTION TO DISMISS ADVERSARY PROCEEDING

**GOLDBERG KOHN LTD.**
David E. Morrison
Danielle D. Juhle
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 201-4000
david.morrison@goldbergkohn.com
danielle.juhle@goldbergkohn.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Eric D. Schwartz (No. 3134)
Thomas W. Briggs, Jr. (No. 4076)
Matthew B. Harvey (No. 5186)
Barnaby Grzaslewicz (No. 6037)
Paige N. Topper (No. 6470)
1201 North Market Street, P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
eschwartz@mnat.com
tbriggs@mnat.com
MHarvey@MNAT.com
bgrzaslewicz@MNAT.com
ptopper@mnat.com

*January 31, 2020    Counsel to Defendant MidCap Funding IV Trust*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); and Vorbas, LLC (8936). The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

# TABLE OF CONTENTS

Page

NATURE AND STATEMENT OF PROCEEDING ..................................................... 1

SUMMARY OF ARGUMENT ................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 3

    I.    TA Dispatch Entered into Contracts Creating Payment Obligations of the Celadon Companies. .................................................................................. 3

    II.    The Funds at Issue were Never Placed into a Segregated Bank Account. ............. 4

    III.    TA Dispatch Alleges that Celadon Initially Remitted Payment to TA Dispatch, but Later Breached Its Payment Obligations. ........................................ 4

    IV.    Defendant Entered into a Secured Revolving Credit Facility with Certain Debtors and has the Contractual Right to Sweep the Debtors' Bank Accounts Pursuant to Such Agreement. ................................................................ 5

    V.    Unable to Collect from the Debtors, TA Dispatch Sued Defendant to Recover Funds Commingled and then Swept from the Debtors' Unsegregated Account. ............................................................................................. 9

    VI.    The Bankruptcy Court Entered the Financing Order Which Provided for the Postpetition Segregation of Proceeds of Accounts Receivable. ....................... 9

STANDARD OF REVIEW ...................................................................................... 10

JURISDICTION ....................................................................................................... 12

ARGUMENT ............................................................................................................ 12

    I.    The Court Should Disregard TA Dispatch's Numerous Conclusory Allegations. ............................................................................................................ 12

    II.    The Complaint Fails to State a Claim for Tortious Interference. ......................... 12

        A.    TA Dispatch Cannot Show an Intentional Act by Defendant that was a Significant Factor in the Celadon Companies' Breach of Their Payment Obligations. ...................................................................... 13

            1.    The Alleged Breach of Contract Here is the Celadon Companies' Failure to Pay. ............................................................ 13

            2.    The Complaint does Not Show that Defendant Took any Action that Would Constitute an Intentional Act that Significantly Motivated the Failure to Pay. .................................. 14

        B.    TA Dispatch has Not Shown that Defendant Acted Without Justification. .......................................................................................... 17

            1.    The Nature of Defendant's Conduct Favors Defendant. ............... 17

            2.    The Actor's Motive Favors Defendant. ......................................... 18

3.     There was No Proximity Between Defendant's Receipt of Swept Funds from the Lockbox Account and the Celadon Companies' Failure to Pay. ........................................................... 19

4.     The Secured Creditor-Debtor Relationship Between Defendant and the Celadon Companies also Favors Defendant. .................................................................................. 20

5.     As a Matter of Law, the Other Factors that Arguably Could Favor TA Dispatch are Outweighed by the Factors Supporting Defendant. ................................................................. 23

III.     The Complaint Fails to State a Claim Against the Revolving Lender for Unjust Enrichment. ....................................................................................... 23

A.     Count II Should be Dismissed Because There is No Cause of Action for Unjust Enrichment Arising From a Breach of the Transaction Documents. ........................................................... 24

B.     Count II Should be Dismissed Because Defendant Exercised Its Contractual Rights Under the Credit Agreement. .................................... 25

C.     Count II Should be Dismissed Because TA Dispatch Cannot Show a Lack of Justification When the Debtors Commingled Their Funds. ....................................................................................... 26

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

Cases

*AM Gen. Holdings LLC v. Renco Grp., Inc.*,
  No. 739-VCN, 2013 WL 5863010 (Del. Ch. Oct. 31, 2013)..............................................24, 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................................10, 11

*Aspen Advisors LLC v. United Artists Theatre Co.*,
  861 A.2d 1251 (Del. 2004) ........................................................................................................14

*Avins v. White*,
  627 F.2d 637 (3d Cir. 1980) ......................................................................................................19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................................10, 11

*Burch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ......................................................................................................11

*Burch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*,
  466 B.R. 626 (Bankr. D. Del. 2012) .....................................................................................11, 25

*Connelly v. Lane Constr. Corp.*,
  809 F.3d 780 (3d Cir. 2016) ......................................................................................................11

*Coronation Sheet Metal Co. v. Interchange Bank (In re KI Liquidation, Inc.)*,
  No. 08-cv-611, 2008 WL 5109369 (D.N.J. Dec. 1, 2008) ......................................26, 27, 28, 29

*Corp. Claims Mgmt, Inc. v. Michelle Shaiper & Brentwood Servs. Admins., Inc. (In re Patriot Nat'l Inc.)*,
  592 B.R. 560 (Bankr. D. Del. 2018) ......................................................................................11, 12

*DHP Holdings II Corp. v. Home Depot, Inc. (In re DHP Holdings II Corp.)*,
  435 B.R. 264 (Bankr. D. Del. 2010) ..........................................................................................12

*EBS Pension, LLC v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.)*,
  268 B.R. 409 (Bankr. D. Del. 2001) ..........................................................................................28

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d. Cir. 2009) ......................................................................................................11

*Giuliano v. Genesis Fin. Sol., Inc. (In re Axiant, LLC)*, Adv. No. 12-50526,
  2012 WL 5614588 (Bankr. D. Del. No. 15, 2012) ....................................................................12

*Goldberg v. N.J. Lawyers' Fund for Client Protection*,
   932 F.2d 273 (3d Cir. 1991) ................................................................ 27

*Hursey Porter & Assocs. v. Bounds*,
   No. 93-cv-01091, 1994 WL 762670 (Del. Super. Ct. Dec. 2, 1994)................................. 13, 19

*In re Ames Dept. Stores, Inc.*,
   274 B.R. 600 (Bankr. S.D.N.Y. 2002).................................................... 22

*In re Amp'd Mobile, Inc.*,
   377 B.R. 478 (Bankr. D. Del. 2007) .................................................... 25, 26, 29, 30

*In re Lehigh & New England Ry. Co.*,
   657 F.2d 570 (3d Cir. 1981) ............................................................ 28

*Int'l Const. Prods. LLC v. Caterpillar Inc.*,
   No. 15-108-RGA, 2019 WL 5086957 (D. Del. Oct. 10, 2019) ................................ 4

*Jing-Jing v. Weyland Tech, Inc.*,
   No. 17-446, 2017 WL 2618753 (D. Del. June 15, 2017) ...................................... 11

*Kable Prods. Servs., Inc. v. TNG GP*,
   No. 16-05194, 2017 WL 2558270 (Del. Super. Ct. June 13, 2017) ........................... 13

*Kedra v. Schroeter*,
   876 F.3d 424 (3d Cir. 2017) ............................................................ 11

*Kuroda v. SPJS Holdings, L.L.C.*,
   971 A.2d 872 (Del. Ch. 2009) .......................................................... 24

*LFD Operating, Inc. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.)*,
   No. 02-cv-6271, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004) .................................. 21, 22, 30

*LFD Operating, Inc. v. Gen. Elec. Capital Corp. (In re Ames Dept. Stores, Inc.)*,
   No. 06-cv-5394, 2008 WL 7542200 (S.D.N.Y. June 4, 2008) ................................. 22

*Mayer v. Belichick*,
   605 F.3d 223 (3d Cir. 2010) ............................................................ 4

*Nemec v. Shrader*,
   991 A.2d 1120 (Del. 2010) ............................................................. 24, 25

*Official Comm. of Unsecured Creditors of the Columbia Gas Transmission Corp. v.
Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*,
   997 F.2d 1039 (3d Cir. 1993) .......................................................... 26, 28

*Official Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*,
422 B.R. 5 (Bankr. D. Del. 2010) ...................................................................................... 15, 20

*WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*,
49 A.3d 1168 (Del. 2012) ........................................................................................... 17, 18, 19

*WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*,
No. 08C-11-132-JOH, 2011 WL 5314507 (Del. Super. Ct. Oct. 31, 2011) ...................... *passim*

<u>Rules</u>

Fed. R. Bankr. P. 7012 ........................................................................................................ 2, 10

Fed. R. Civ. P. 8(a)(2) ............................................................................................................. 10

Fed. R. Civ. P.  12(b)(6) ..................................................................................................... *passim*

## NATURE AND STATEMENT OF PROCEEDING

This is the first responsive pleading in this adversary case.

## SUMMARY OF ARGUMENT[2]

This Court should take into account all available, credible information before it and swiftly conclude that Plaintiff TA Dispatch, LLC ("Plaintiff" or "TA Dispatch") cannot show as a matter of law that it has any basis to bring its claims for tortious interference with contract and unjust enrichment against defendant MidCap Funding IV Trust ("Defendant" or "Revolving Lender"). TA Dispatch is a general unsecured creditor of certain of the Debtors who previously filed a state court complaint against those Debtors for having failed to make certain prepetition payments to TA Dispatch under certain contractual agreements.  As a result of the Debtors' bankruptcy filings, that complaint was automatically stayed.  But rather than file a general unsecured proof of claim for the prepetition debt obligations, TA Dispatch filed this action against the Debtors' Revolving Lender asserting that the Revolving Lender tortiously interfered with the Debtors' performance of their contractual payment obligations to TA Dispatch and was unjustly enriched as a result of cash management procedures, including daily lockbox and collections sweeps from certain of the Debtors' bank accounts, pursuant to and in accordance with a prepetition, revolving secured asset-based lending agreement.  TA Dispatch cannot establish that the Revolving Lender, acting in its capacity as lender and agent, acted inappropriately by receiving swept funds that were remitted from collection accounts subject to deposit account control agreements executed by the Debtors to implement such daily remittance procedures.

TA Dispatch's tortious interference with contract claim fails on several levels.  First, TA Dispatch has not shown through well-pleaded facts that the Revolving Lender (i) took any

---

[2] Capitalized terms not defined in this section shall have the same meanings ascribed to them later in this brief or as defined in the Complaint.

intentional act, or (ii) that any act *significantly interfered* with the Celadon Companies' failure to pay TA Dispatch, the only breach at issue in this case.  Second, the Revolving Lender was, as a matter of law, justified in taking the only act at issue here receiving swept funds from the Debtors' collection accounts were subject to a controlled account in accordance with a cash management system and secured revolving credit facility typical of a revolving ABL credit facility.

Further, Plaintiff cannot bring an unjust enrichment claim premised on a breach of contract. Moreover, in seeking to recover the funds under a theory of unjust enrichment, TA Dispatch essentially requests this Court to impose a constructive or equitable trust over certain accounts receivable received by the Debtors (but fails to state a claim in its Complaint against Defendant ("Complaint") to support this relief), extend any such constructive trust theory beyond that which is supported by the law (as a result of both commingling and the fact that funds in a commingled account were entirely dissipated as a result of the Debtors' cash management system), and cause the Revolving Lender to disgorge "the Swept Funds" (Compl. ¶ 13.) which are not identifiable or traceable.  Such argument also is based on the allegation that the Defendant retained such funds and ignores the fact that the Defendant at all times prior to the Petition Date continued to administer a revolving loan, making weekly (or more frequent) advances based on the Debtors' formulaic borrowing requests prior to the Petition Date.  Like the tortious interference claim, the unjust enrichment claim (and thus the derivative declaratory judgment claim in Count III) fails as a matter of law.  Thus, this Court should dismiss the Complaint under Fed. R. Civ. P. Rule 12(b)(6), as made applicable by Fed. R. Bankr. P. 7012.

## STATEMENT OF FACTS

I.    **TA Dispatch Entered into Contracts Creating Payment Obligations of the Celadon Companies.**

TA Dispatch and Celadon Group, Inc. and certain of its affiliates (the "Celadon Companies") were parties to certain agreements, each entered into on April 15, 2019, including an Asset Purchase Agreement ("APA"), Capacity Solutions/Denver LTL Agreement ("CSA"), Co-Broker Agreement ("Co-Broker Agreement") and certain Agency Agreements (together with the APA and CSA, collectively, the "Transaction Documents"). (Compl. ¶ 23, & Compl. Exhs. A-D.)[3] Defendant is not party to those agreements, and has no contractual relationship with TA Dispatch.

Under the APA, certain assets (the "Purchased Assets") of the Celadon Companies were sold to TA Dispatch, including accounts receivable due and payable to the Celadon Companies on account of certain contracts. (Compl. ¶¶ 24-25.) In accordance with the Co-Broker Agreement, the payment by the Celadon Companies to TA Dispatch for shipments received under this agreement is due within ten (10) days of receipt or fifty (50) days after receipt of an invoice. (Compl. ¶¶ 35-36; Compl. Exh. D, Appendix A.) Further, under the Transaction Documents, certain freight loads tendered by customers to the Celadon Companies would be transferred to TA Dispatch and certain of the Celadon Companies would broker certain shipments to TA Dispatch pursuant to the terms of the CSA and Co-Broker Agreement. (Compl. ¶¶ 5-6.) In accordance with the CSA, the Celadon Companies had fifty (50) days of receipt of an invoice from TA Dispatch to remit payment to TA Dispatch. (Compl. ¶ 33; Compl. Exh. C, § 1.03.) The Debtors were not obligated to segregate or hold any money in trust for TA Dispatch. Therefore, any claim that TA

---

[3] Exhibits A through D to the Complaint were filed under seal in state court and have not been made publicly available, although the sections referred to herein are in the public record. *See* D.I. 381 at ¶¶ 9-10. These documents will be provided to this Court following the resolution of any confidentiality concerns.

Dispatch may have for breach of the Transaction Documents would result in only a general prepetition unsecured claim against the Debtors who are party to the Transaction Documents.

## II.    The Funds at Issue were Never Placed into a Segregated Bank Account.

On or about December 2, 2019, TA Dispatch filed a verified complaint against certain Debtors in the Court of Chancery of the State of Delaware, Case No. 2019-0960-SG (the "Verified Celadon Complaint").  A true and correct copy of the Verified Celadon Complaint is attached hereto as Exhibit A. *See also* Compl. ¶ 39 (referring to allegations contained in the Verified Celadon Complaint). [4]  The Verified Celadon Complaint repeatedly asserts, among other things, that the funds received by the Debtors under the Transaction Documents were "earmarked" for TA Dispatch.  (Verified Celadon Compl. ¶ 57.)  Yet, the Transaction Documents contain no obligation to segregate the CSA Proceeds and Accounts Receivables (as defined in the Complaint) from the Debtors' other general accounts.  Indeed, TA Dispatch admitted in the Verified Celadon Complaint that the Debtors did not segregate the CSA Proceeds and Accounts Receivable.  *Id.* at ¶ 63.  There was no agreement or requirement in the Transaction Documents that the Debtors collect any amounts in trust for TA Dispatch.  Likewise, there were no requirements within the Transaction Documents that the Debtors segregate and not commingle such proceeds, or that the Debtors not deposit such proceeds into Debtors' depository accounts subject to a sweep to the Debtors' lenders.

## III.    TA Dispatch Alleges that Celadon Initially Remitted Payment to TA Dispatch, but Later Breached Its Payment Obligations.

In the Verified Celadon Complaint, TA Dispatch states that "[the Celadon Companies] initially remitted to [TA Dispatch] the Accounts Receivable relating to the Purchased A/R, in

---

[4] In reviewing this motion, this Court may consider "exhibits attached to the complaint, documents incorporated by reference, and items subject to judicial notice."  *Int'l Const. Prods. LLC v. Caterpillar Inc.*, No. 15-108-RGA, 2019 WL 5086957, at *3 (D. Del. Oct. 10, 2019) (considering attachments to the complaint including emails and a power point presentation in granting motion to dismiss); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputed authentic documents if the complaint's claims are based upon these documents.").

accordance with the APA and CSA." (Verified Celadon Compl. ¶ 53.)  It was only after the Celadon Companies' financial condition declined that the remittance of the Accounts Receivable and CSA Proceeds stopped. *Id.* at ¶¶ 49-53.  Likewise, in the Complaint, TA Dispatch claims repeatedly that Celadon "stop[ped] remitting the Accounts Receivable and CSA Proceeds to Plaintiff." Compl. at p. 11, heading B; *see also id*. at ¶ 48 ("the Celadon Companies began to short (or not) pay Plaintiff for monies it owed Plaintiff for the Accounts Receivable[] and CSA Proceeds"), and ¶ 62 (alleging that Defendant interfered with "the Celadon Companies' performance of their obligations to remit to Plaintiff the Accounts Receivable and CSA Proceeds"). In fact, TA Dispatch has provided this Court with sworn evidence that the Debtors' Chief Executive Officer admitted that the Celadon Companies "have spent most, if not all, of the Accounts Receivable and CSA Proceeds in their possession." (Verified Celadon Compl. ¶ 61.) TA Dispatch elaborated further in the Complaint that the Celadon Companies initially were "delaying payment and failing to remit the full amount due" but then completely "ceased remitting the Accounts Receivable and CSA Proceeds … because they began using Plaintiff's funds to prop up their business operations in an attempt to avoid (or at least better position themselves for) bankruptcy." (Compl. ¶ 38.)  TA Dispatch asserts that it is owed $4.4 million on account of the CSA Proceeds, and $1.8 million on account of the Accounts Receivable.  (Compl. ¶ 65.)  All such allegations indicate and confirm that it was the Debtors' actions that resulted in the alleged non-payment of TA Dispatch; not any action by the Revolving Lender.

IV.     **Defendant Entered into a Secured Revolving Credit Facility with Certain Debtors and has the Contractual Right to Sweep the Debtors' Bank Accounts Pursuant to Such Agreement.**

        In its Complaint, TA Dispatch acknowledged that "[i]n accordance with its lending agreements between Defendant and the Celadon Companies," the Prepetition ABL Credit Agreement entitles the Revolving Lender to "'sweep' funds from the Celadon Companies' bank

accounts and deposit the swept funds into Defendant's bank accounts." Compl. ¶ 43; *see also id*.

at ¶ 48 ("Defendant initiated the daily cash sweeps on the Celadon Companies' bank accounts…")).

The lending agreements Plaintiff refers to in the Complaint include that certain Credit and Security

Agreement (as amended, restated, supplemented or otherwise modified from time to time, the

"Prepetition ABL Credit Agreement") which was executed and delivered by certain of the Debtors

on July 31, 2019, with the Revolving Lender as agent, and certain lenders party thereto (the

"Secured Parties").  Defendant, as successor by assignment, is the agent and a secured lender.  (D.I.

230 at (E)(i); *see also* Compl. ¶ 42 (identifying Defendant as one of the Debtors' largest secured

lenders).  A true and correct copy of the Prepetition ABL Credit Agreement is attached hereto as

Exhibit B (as filed with the SEC at Exh. 10.2 to the Celadon Group, Inc. Form 8-K at Item 1.01

(July 31, 2019) (Entry into a Material Definitive Agreement)).

      Pursuant to the Prepetition ABL Credit Agreement and the other "Prepetition ABL Loan

Documents," the Secured Parties provided certain of the Debtors with an asset-based credit facility

with $60 million of maximum aggregate availability, subject to a sublimit or "cap" determined by

borrowing base formula which is based on Debtors' accounts receivable from time to time (as

reduced by reserves).  (D.I. 230 at (E)(i).)  The obligations were secured by first priority security

interests in and liens on the ABL Priority Collateral (as defined in the *Final Order Pursuant to 11*

*U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior*

*Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority*

*Administrative Expense Claims and (B) Adequate Protection of Certain Prepetition Lenders; (III)*

*Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related*

*Relief* (as amended, supplemented, or otherwise modified from time to time, the "Financing

Order").  (D.I. 230 at (E)(i).)  As an "all assets" lien, the ABL Priority Collateral included, but was

not limited to: (a) all Accounts (other than Accounts arising under agreements for the Disposition of Term Priority Collateral); (b) all Deposit Accounts (other than any Asset Sale Proceeds Account) and all Money or other assets (including all cash equivalents), Financial Assets and Securities Entitlements contained in, or credited to, or arising from any such Deposit Accounts; and (c) all Proceeds of each of the foregoing.  *Id*. at n. 6.

The Prepetition ABL Credit Agreement is a "Revolving Loan" agreement. Exh. B at § 2.1. Accordingly, the Prepetition ABL Credit Agreement required the Celadon Companies to "maintain one or more Lockbox Accounts," such that "all collections of Accounts are paid directly by Account Debtors (i) to a Lockbox, for deposit into the Lockbox Account and/or (ii) directly into the Lockbox Account."  *Id*. at § 2.11(a).  The Prepetition ABL Credit Agreement clearly expresses that *all* funds deposited in the Lockbox will be transferred to the Revolving Lender to reduce the then outstanding obligations under the Prepetition ABL Credit Agreement.  *See id*. at § 2.11(d) ("*All* funds deposited into a Lockbox Account shall be transferred into the Payment Account by the close of each Business Day" and Defendant as "Agent shall *apply, on a daily basis, all funds transferred into the Payment Account pursuant to this Section to reduce the outstanding Revolving Loans* in such order of application as agent shall elect.") (emphasis added).  The Prepetition ABL Credit Agreement explicitly states that "Borrowers shall not, and Borrowers shall not suffer or permit any Credit Party to, (i) withdraw any amounts from any Lockbox Account, (ii) change the procedures or sweep instructions under the agreements governing any Lockbox Accounts, or (iii) send to or deposit in any Lockbox Account any funds other than payments made with respect to and proceeds of Accounts or other Collateral."  *Id.* at §2.11(g).

To effectuate such cash management arrangement, the "lending agreements" included a deposit account control agreement, also effective July 31, 2019, pursuant to which a depository

bank, the Revolving Lender, the Prepetition Term Loan Agent and such Celadon Companies agreed that the depository bank would comply with the disposition instructions set forth therein. Those instructions provided that, on each business day, the depository bank would transfer the full amount of the balance from the accounts to the destination account.[5] As a result, as the Complaint alleges, "[b]etween approximately August 5, 2019 and December 13, 2019, on almost a daily basis, Defendant swept" all funds from a blocked account, sweeping "approximately $23.6 million of funds, including Plaintiff's Accounts Receivable and CSA Proceeds." (Compl. ¶ 45.)

In addition to the procedures established for the remittance of collections, as is typical of an asset-based lending arrangement, upon the borrowers' request, the Revolving Lender also regularly made revolving loans to the borrowers, subject to the limits of credit availability under the Prepetition ABL Credit Agreement. *See* Exh. B at § 2.1(b). It is also customary in an asset-based lending arrangement that all of a borrower's cash receipts be directed into a lockbox to be swept to the revolving lender and applied to the outstanding revolving balance, which creates new "availability" under the revolving line for additional borrowings, and so forth – thus creating the "revolving" nature of the credit facility. Thus, as of December 8, 2019 (the "Petition Date"), when the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), the Debtors were liable for payment of the "Prepetition ABL Obligations," as defined in the Financing Order, in an amount of not less than $32,461,556.99. (D.I. 230 at (E)(i).)

---

[5] As alleged in the Complaint, under the terms of the Prepetition ABL Credit Agreement the Debtors were obligated to, and did pursuant to certain deposit account control agreements, cause their depository institutions to sweep balances in their accounts to Defendant under each business day. (Compl. ¶ 45.)

V. **Unable to Collect from the Debtors, TA Dispatch Sued Defendant to Recover Funds Commingled and then Swept from the Debtors' Unsegregated Account.**

As a result of the chapter 11 petitions, the Verified Celadon Complaint was automatically stayed.[6]  On January 6, 2020, TA Dispatch filed the Complaint in the Superior Court against the Revolving Lender, based on its role as administrative agent and lender under the Prepetition ABL Credit Agreement, seeking a declaratory judgment and "restitution of the Swept Funds" under theories of tortious interference with contract and unjust enrichment.  (Compl. p. 20.)[7]  This action is predicated on the same facts and legal theories as the Verified Celadon Complaint, both of which allege that:

- TA Dispatch seeks approximately $6.2 million (Compl. ¶ 1; Verified Celadon Compl. ¶ 1);

- amounts owed to TA Dispatch "arise[] from" the APA, CSA and Co-Broker Agreement (Compl. ¶¶ 2-4; Verified Celadon Compl. ¶¶ 4-5);

- the dispute arose when the Celadon Companies failed to make payments to TA Dispatch (Compl. ¶ 38; Verified Celadon Compl. ¶¶ 6, 53-57);

- the Celadon Companies breached their contract by refusing to remit accounts receivable to TA Dispatch (Verified Celadon Compl., Count I), and that the Revolving Lender tortiously interfered with the Celadon Companies' obligations to perform under their contracts with TA Dispatch (Compl., Count I); and

- the Celadon Companies and Revolving Lender were unjustly enriched (Compl., Count II; Verified Celadon Compl., Count V).

VI. **The Bankruptcy Court Entered the Financing Order Which Provided for the Postpetition Segregation of Proceeds of Accounts Receivable.**

The Complaint refers to various Bankruptcy Court "proceedings" and attaches a Bankruptcy Court order that relate to this matter.  *See* Compl. ¶¶ 53-57; Compl. Exh. E.  The Bankruptcy Court may take judicial notice of the proceedings before it and its prior orders.  Among

---

[6] On January 17, 2020, the Debtors filed a Notice of Removal removing the Verified Celadon Complaint to this Court. *See* Adv. No. 20-50117 (KBO).

[7] By Notice of Removal, dated January 23, 2020, Defendant removed this action to this Court from state court pursuant to 28 U.S.C. § 1452(a) and 28 U.S.C. § 1441(a).

other bankruptcy proceedings and orders, the Bankruptcy Court entered a final order authorizing the Debtors to continue to use certain cash collateral of the Secured Parties subject to the terms and conditions set forth in the Financing Order.  (D.I. 230.)  The Bankruptcy Court also entered a final order approving the Debtors' use of a cash management system, including the maintenance of dominion accounts as noted therein.  (D.I. 238.)  Over TA Dispatch's objections to the entry of the Financing Order, the Bankruptcy Court authorized the Debtors' use of certain cash collateral, and directed the Debtors to remit cash collateral in their possession or control to the Revolving Lender as agent, including by depositing cash collateral into certain of the Debtors' deposit accounts subject to a blocked account control agreement that would remit funds to the Revolving Lender as agent on a daily basis.  *See* Financing Order, at § 3.2(a).  The Bankruptcy Court's orders also required that the Debtors institute postpetition procedures to start segregating proceeds of accounts receivables owned by TA Dispatch and received by the Debtors, Compl. ¶ 53, confirming that the Debtors did not segregate funds purportedly belonging to TA Dispatch prepetition.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6), made applicable to this proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure, requires the plaintiff to state a plausible claim for relief.  Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012.  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility where it contains enough factual content to "allow[] the court to draw the reasonable inference that the defendant is liable for the alleged misconduct" and requires "more than a sheer possibility that the defendant acted unlawfully." *Id.* at 678.  "Where a complaint pleads facts that are 'merely consistent with' a

defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557)).[8]

The Third Circuit applies a two-part test to evaluate the sufficiency of a complaint's allegations:  the court must look first at the factual allegations, as separate from the legal conclusions drawn by the plaintiff, and then determine whether those facts, which must be taken as true, are sufficient to state a "plausible claim for relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d. Cir. 2009).  While the court accepts all well-pleaded allegations as true and construes them in the light most favorable to the plaintiff, *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011), Rule 8's pleading standard demands more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678 (commenting that in *Twombly*, the Court "noted that the plaintiffs' assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth.") (quoting *Twombly*, 550 U.S. at 555).[9]  Thus, even if a complaint's allegations are consistent with improper behavior, a complaint must be dismissed if it alleges activity that "was not only compatible with, but indeed was more likely explained by, lawful … behavior." *Id.* (quoting *Twombly*, 550 U.S. at 567); *Kedra v. Schroeter*, 876 F.3d 424, 441 (3d Cir. 2017).

---

[8] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'- 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 678 (quoting Fed. R. Civ. P. 8(a)(2)).

[9] In evaluating a complaint under Rule 12(b)(6), the court should "separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions," which are not "entitled to the assumption of truth." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016); *Iqbal*, 556 U.S. at 678; *Corp. Claims Mgmt, Inc. v. Michelle Shaiper & Brentwood Servs. Admins., Inc.* (*In re Patriot Nat'l Inc.*), 592 B.R. 560, 578-79 (Bankr. D. Del. 2018) (applying *Iqbal* and *Twombly* to dismiss a tortious interference claim); *Jing-Jing v. Weyland Tech, Inc.*, No. 17-446, 2017 WL 2618753, at **4-5 (D. Del. June 15, 2017) (applying *Iqbal* to deny a tortious interference with prospective business advantage claim finding "Defendants have the right to 'protect [their] business interest in a fair and lawful manner'"); *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626, 638 (Bankr. D. Del. 2012) ("a court need not credit a plaintiff's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss") (internal citations omitted).

## JURISDICTION

The Court has jurisdiction over this motion.  *Giuliano v. Genesis Fin. Sol., Inc. (In re Axiant, LLC)*, Adv. No. 12-50526, 2012 WL 5614588, at *1 (Bankr. D. Del. No. 15, 2012) ("[T]he Court has the power to enter an order on a motion to dismiss even if the [underlying] matter is not core"); *DHP Holdings II Corp. v. Home Depot, Inc. (In re DHP Holdings II Corp.)*, 435 B.R. 264, 268 (Bankr. D. Del. 2010) ("[T]he Court has jurisdiction over this Motion to transfer venue, which is a core proceeding"); *Corp. Claims Mgmt.*, 592 B.R. at 570 ("[T]he Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. … This [motion to dismiss a complaint grounded in bankruptcy law and state tort and statutory law] is a core proceeding under 28 U.S.C. § 157(b) arising under the Bankruptcy Code.").

## ARGUMENT

### I.    The Court Should Disregard TA Dispatch's Numerous Conclusory Allegations.

This Court must ignore TA Dispatch's repeated use of bald assertions and legal conclusions.[10]  The well-pleaded facts show only that Defendant administered a revolving loan facility with Celadon pursuant to the Prepetition ABL Credit Agreement, including the cash management procedures, which cannot give rise to tortious interference or just enrichment claims. Thus, the derivative declaratory judgment claim fails as well.

### II.    The Complaint Fails to State a Claim for Tortious Interference.

To establish a claim for tortious interference under Delaware law, a plaintiff "must show: (1) the existence of a valid enforceable contract; (2) about which the defendant knew; (3) an *intentional act* that was a *significant* factor in causing the breach of the contract; (4) that *that act*

---

[10] This includes TA Dispatch's repeated use of the following words or phrases:  "improperly," "improper," "impede," "impeding," "knowingly interfered," "intentionally interfered," "earmarked," "agents," "misappropriate," "misappropriating," "misappropriated," "without justification," "enriched," "unjustly enriched," and "windfall." Compl. ¶¶ 1, 2, 13, 14, 16, 17, 58, 62, 63, 64, 65, 70, 71, 73, 74.

*was done without justification*; and (5) the act caused injury to the plaintiff." *Kable Prods. Servs., Inc. v. TNG GP*, No. 16-05194, 2017 WL 2558270, at *5 (Del. Super. Ct. June 13, 2017) (emphasis added and internal quotations omitted).  If a plaintiff fails to show any of the elements, the claim must be dismissed.  *Id.* at *9 (dismissing tortious interference claim because plaintiff "would not be entitled to recover for tortious interference with contractual relations under any reasonably conceivable set of circumstances").

A.   **TA Dispatch Cannot Show an Intentional Act by Defendant that was a Significant Factor in the Celadon Companies' Breach of Their Payment Obligations.**

The Court should dismiss Count I because TA Dispatch cannot show the third element of its tortious interference with contract claim.  The only breach of which TA Dispatch complains is the Celadon Companies' breach of their payment obligations under the Transaction Documents. But TA Dispatch has not provided any well-pleaded facts that show that the Revolving Lender took any action that interfered with such an obligation, much less an intentional act that was a significant factor in causing the Celadon Companies to fail to pay TA Dispatch.

1.   **The Alleged Breach of Contract Here is the Celadon Companies' Failure to Pay.**

Based on the well-pleaded allegations, the only alleged breach of contract at issue is the Celadon Companies' failure to remit proceeds of the Accounts Receivable and CSA Proceeds to TA Dispatch.  *See* Compl. at p. 11; ¶¶ 48, 62 & 64.  While TA Dispatch generally expresses regret (and thus admits) that the Debtors never segregated the funds at issue, it fails to identify any express contractual obligation imposed by the Transaction Documents on the Celadon Companies to segregate the funds at issue.  Indeed, the only reasonable interpretation of the Transaction Documents is that no such obligation exists.  *See Hursey Porter & Assocs. v. Bounds*, No. 93-cv-01091, 1994 WL 762670, at *4 (Del. Super. Ct. Dec. 2, 1994) ("Under Delaware law, the

interpretation of contractual language is a question of law."). When sophisticated parties want to impose an obligation to segregate funds, such an obligation should be expressly stated in the agreement. As there can be no breach of contract claim brought on the failure to segregate funds, the failure to segregate funds is not a contractual breach upon which the tortious interference claim is premised. *See Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1254 (Del. 2004) (affirming dismissal of complaint for alleged tortious interference because the "claim had failed to state a cause of action for breach of [contract], a necessary element of a claim for tortious interference with a contract under Delaware law."). As a result, in assessing Court I, the Court should look only to the alleged breach at issue, which is the failure to pay.

        **2.**     **The Complaint does Not Show that Defendant Took any Action that Would Constitute an Intentional Act that Significantly Motivated the Failure to Pay.**

Count I should be dismissed because the well-pleaded facts do not show that Defendant engaged in any intentional act relating to the Celadon Companies' failure to pay. The Complaint accuses the Revolving Lender of only one intentional act: sweeping the Celadon Companies' bank account in accordance with its loan agreement and deposit account control agreements. Compl. ¶¶ 1, 13, 16, 17, 44-45. The Complaint readily concedes that the Defendant was the Celadon Companies' secured lender and as lender and agent had the right to sweep the bank accounts, which is not disputable given that the Prepetition ABL Credit Agreement required the implementation of cash management procedures noted above. Compl. ¶ 43; Exh. B at § 2.11(a), (d). But, there is no reasonable inference that can connect Defendant's proper receipt of daily swept funds from the Debtors' bank accounts to the Celadon Companies' failure to pay TA Dispatch. Rather, the only reasonable inference drawn from the Complaint's well-pleaded facts is that the Revolving Lender

was merely administering a revolving loan under a revolving credit line with daily sweeps of all funds in the Lockbox Account.[11]

Moreover, after applying swept funds to outstanding loan balances, the Revolving Lender would regularly advance revolving loans to the borrowers, subject to the limits of credit availability under the Prepetition ABL Credit Agreement. *See* Exh. B at § 2.1(b). As a result of such revolving loans, it is undisputed that, as of the Petition Date, the Debtors were liable for payment of the Prepetition ABL Obligations in an amount of not less than $32,461,556.99. (D.I. 230 at (E)(i).) Defendant's receipt of swept funds and re-advancement of loaned funds, all in accordance with the Prepetition ABL Credit Agreement, did not play any role in the Celadon Companies' independent decision as to which creditors they would pay to keep their faltering business afloat. *See Official Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 422 B.R. 5, 12 (Bankr. D. Del. 2010) (applying *Iqbal* to grant a motion to dismiss, finding: "the Complaint demonstrates that Fedders received funds to pay off an existing credit facility that was in default and stay in business through the summer selling season. The facts pled in the Complaint therefore support the conclusion that Fedders was benefitted by the loans at least as readily as they support the conclusion that Fedders was harmed thereby.")

Indeed, even TA Dispatch's complaints recognize the fallacy of its argument. *See* Verified Celadon Compl. ¶ 53 (TA Dispatch alleges that "[the Celadon Companies] initially remitted to [TA Dispatch] the Accounts Receivable relating to the Purchased A/R, in accordance with the APA and CSA."); Compl. ¶ 38 (the "Celadon Companies failed to make these payments to Plaintiff

---

[11] The Debtors had a similar lending arrangement in place prior to entering the Prepetition ABL Credit Agreement with the Revolving Lender. Indeed, Debtors refinanced their prior existing obligations owing to Bank of America and other lenders under a similar revolving credit agreement, which also was secured by a lien on Debtors' accounts and depository accounts. The prior relationship with Bank of America also featured a sweep of account balances to pay down the revolving obligations, which sweep was in effect at the same time of the closing of TA Dispatch's Transaction Documents. *See* Exh. B; *Emergency Motion of the Debtors and the Committee Extending the Automatic Stay and for Related Relief* (D.I. 381 at ¶¶ 12, 17 & n.6.)

because *they* began using Plaintiff's funds to prop up their business operations in an attempt to avoid (or at least better position themselves for) bankruptcy.") (emphasis added). In TA Dispatch's Verified Celadon Complaint, TA Dispatch swore under oath that the Debtors' Chief Executive Officer admitted that the Celadon Companies "have spent most, if not all, of the Accounts Receivable and CSA Proceeds in their possession." Verified Celadon Compl. ¶ 61. The Celadon Companies' business was simply failing, and it was as a result that TA Dispatch acknowledged that the remittance of the Accounts Receivable and CSA Proceeds stopped after the Defendants' financial condition declined. *Id*. at ¶ 53. Celadon's decision to stop paying TA Dispatch had nothing to do with the Revolving Lender or the cash management sweeps that were in place from July 31, 2019 (and therefore during periods of time that TA Dispatch acknowledges the Celadon Companies were making payments to it). As TA Dispatch alleges in its Verified Celadon Complaint, the Celadon Companies' annual revenues decreased from $1.18 billion to $500 million, they had negative operating income, could not meet their debt obligations as they came due, and had depleted their cash reserves by $21.5 million in the 90-day period prior to November 13, 2019. *Id.* at ¶¶ 50-51. It is these industry events and the Debtors' liquidity situation that caused the Celadon Companies to fail to pay TA Dispatch, not the Revolving Lender, who loaned the Debtors tens of millions of dollars.

Moreover, there is no allegation in the Complaint that Defendant directed or convinced the Celadon Companies not to pay TA Dispatch, how to run their businesses, or engaged in any other conduct that would impact creditor payments. TA Dispatch has simply failed to show how Defendant took action that *significantly motivated* the Celadon Companies' breach of their payment obligations to TA Dispatch when the Celadon Companies made their own decision to use

the Accounts Receivable and CSA Proceeds to operate their businesses.  For this reason alone, the Court should dismiss Count I.

### B.    TA Dispatch has Not Shown that Defendant Acted Without Justification.

Count I also fails because TA Dispatch has not shown the Court how Defendant acted without justification.  Ignoring the conclusory and legal assertions, as it must, the act of receiving funds under a deposit account control agreement executed by the Celadon Companies is not an intentional act that significantly motivated the Celadon Companies not to pay TA Dispatch, but the receipt of such funds from the Lockbox Account in connection with a revolving loan credit facility also is justified and cannot support a finding of improper conduct.

Delaware follows Section 767 of the Restatements (Second) of Torts in assessing a tortious interference claim.  *See WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).  That analysis requires courts applying Delaware law to asses several factors to determine if a plaintiff has adequately pleaded intentional interference without justification.  *Id.*  The factors overwhelmingly favor Defendant: (1) the nature of Defendant's conduct (receiving swept funds deposited in a Lockbox Account pursuant to Revolving Lender's contractual rights), (2) Defendant's sole motive was not to harm TA Dispatch when it was acting to protect the Secured Parties, (3) the most remote of connections between the receipt of swept funds and the Debtors' failure to pay TA Dispatch, and (4) Defendant's creditor relationship to the Debtors.   As a matter of law, TA Dispatch has not shown that Defendant acted without justification.

### 1.    The Nature of Defendant's Conduct Favors Defendant.

First, Delaware courts consider the nature of the actor's conduct.  *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, No. 08C-11-132-JOH, 2011 WL 5314507, at *12 (Del. Super. Ct. Oct. 31, 2011), *aff'd* 49 A.3d 1168 (Del. 2012). In *WaveDivision*, a potential purchaser

of a cable television system brought a tortious interference with contract claim against the seller's creditors, including senior lenders, who refused to consent to the sale.  The plaintiff claimed that the defendants "successfully convince[d the seller] to refinance its debt rather than pursuing the Agreements to sell its assets to it."  *Id.*  While the defendants unquestionably took several intentional acts—they failed to provide consent for the sale, and proposed alternative refinance packages to the borrower—the court concluded the defendants "had legitimate reasons for taking these actions… defendants stood to lose their investment in [the seller]."  *Id.*  Thus, the nature of the defendant's conduct favored a finding that the defendant's interference was not improper.  *Id.*

Here, as discussed above, there is not even an allegation that Defendant convinced the Celadon Companies to take *any* action.  Moreover, the act of implementing a cash management procedure that causes funds in a Lockbox Account to be swept and applied to the balance of secured loans is a legitimate and practical payment structure in most asset-based revolving loan arrangements, and merely provides a necessary repayment mechanic for the revolving debt to be repaid, so that additional revolving loans may be advanced thereafter.  The nature of Defendant's conduct favors only one conclusion: that Defendant was justified in taking its action.

## 2.   The Actor's Motive Favors Defendant.

Under Delaware law, the plaintiff must show that the defendant's *sole* motive was to interfere with the contract in order to state a claim for tortious interference with contract.  *See WaveDivision Holdings*, 49 A.3d at 1174.  On its appeal to the Delaware Supreme Court in *WaveDivision Holdings*, the plaintiff argued that "courts must evaluate any improper motive together with any proper motive, to determine which motive predominates …." *Id.*  The Delaware Supreme Court flatly rejected that argument, holding that "justification does not require that the defendant's proper motive be its sole or even its predominate motive for interfering with the

contract. Only if the defendant's *sole* motive was to interfere with the contract will this factor support a finding of improper influence." *Id.* (emphasis in original).

In *WaveDivision Holdings*, the Superior Court found that the defendants acted to "protect their investment in [the seller]." *Id.* at 1175. Thus, the Delaware Supreme Court held that "[e]ven if we accept as true Wave's contention that the [defendants] *also had an improper motive*, Wave cannot prevail on that basis *as a matter of law*." *Id*. (emphasis added). The plaintiff's case was compromised, in part, because the "Agreements unambiguously provided that consummation of the Sale was conditioned upon consent of the Senior Lenders …" *Id.* at 1176. Likewise, here, the Prepetition ABL Credit Agreement provides unambiguously that the Defendant was entitled to sweep the Lockbox Account of *all* funds contained therein. It cannot be reasonably inferred from these facts that when Defendant swept the Lockbox Account that it was *solely* motivated to interfere with TA Dispatch's contractual right to payment. In fact, by Plaintiff's own admission, there was no such interference and the Celadon Companies initially paid TA Dispatch the Accounts Receivable and CSA Proceeds during periods of time that such cash management procedures were in place. *See also Hursey Porter & Assocs.*, 1994 WL 762670, at *16. This factor also favors Defendant in evaluating whether any action it is alleged to have taken in connection with the Debtors was justified.

3.  **There was No Proximity Between Defendant's Receipt of Swept Funds from the Lockbox Account and the Celadon Companies' Failure to Pay.**

In evaluating whether the interference was justified, the Court must consider whether the interference was "an immediate or remote consequence of the actor's conduct." *WaveDivision*, 2011 WL 5314507, at *13. This is a "but for" test – plaintiffs must show that without the interference, there would not have been a breach. *Avins v. White*, 627 F.2d 637, 650 (3d Cir. 1980). For example, in *WaveDivision*, because the lenders did not consent to the proposed sale, "[the

seller's] termination of the Agreements was an immediate consequence of defendants' action." *WaveDivision*, 2011 WL 5314507, at *13. Plaintiff, however, fails here to show "but for" causation exists between the Revolving Lender's receipt of the swept funds and the Debtors' failure to pay TA Dispatch, particularly given that the Revolving Lender applied the funds remitted from the blocked accounts daily and regularly advanced revolving loans to the Debtors. [12] The Celadon Companies independently decided who to pay with the proceeds of those revolving loans. Thus, Plaintiff cannot show causation as a matter of law. This factor must favor the Revolving Lender.

### 4.    The Secured Creditor-Debtor Relationship Between Defendant and the Celadon Companies also Favors Defendant.

The Court also must separately consider the relationship that existed between Defendant and the Celadon Companies in assessing the justification prong. Where there is a "debtor-creditor relationship" between the defendant and the breaching party, such factor weighs in favor of the Defendant acting to protect its financial investment (here, a secured loan). *WaveDivision*, 2011 WL 5314507, at *13. The Complaint seeks to parse this factor too finely when alleging that even though the Revolving Lender was entitled to swept funds from certain of the Celadon Companies' bank accounts, it was not entitled to swept funds *owned by TA Dispatch* that were held in those accounts. Compl. ¶¶ 43-44. The Prepetition ABL Credit Agreement makes clear that *all* funds contained in the Lockbox Account were to be swept, and that it was incumbent upon the Celadon Companies to deposit into the Lockbox Account only those funds that constituted Defendant's collateral. *See* Exh. B at §2.11(g) ("Borrowers shall not, and Borrowers shall not suffer or permit any Credit Party to, (i) withdraw any amounts from any Lockbox Account, (ii) change the procedures or sweep instructions under the agreements governing any Lockbox Accounts, or (iii)

---

[12] For the same reasons, TA Dispatch cannot show that it was injured as required by the fifth element of a tortious interference claim. *See In re Fedders*, 422 B.R. at *12.

*send to or deposit in any Lockbox Account any funds other than payments made with respect to and proceeds of Accounts or other Collateral*.") (emphasis added).

Thus, the Celadon Companies' failure to segregate the funds to which TA Dispatch claims an ownership interest negatively impacts TA Dispatch, not Defendant.  "As a general rule, once funds are deposited in a bank account, the account holder—here [the debtor]—is presumed to have title to and control over those funds."  *LFD Operating, Inc. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.)*, No. 02-cv-6271, 2004 WL 1948754, at *4 (S.D.N.Y. Sept. 1, 2004).  The facts in *LFD Operating* are squarely on point here.  There, the debtor contracted with the plaintiff to operate shoe departments in its stores, and the debtor was contractually obligated to turn over the proceeds, minus its share (the "Net Sales Proceeds"), to the plaintiff on a weekly basis.  *Id.* at *1.  The debtor, though, "did not maintain separate bank accounts for the [Net Sales Proceeds]."  *Id.* at *2.  Instead, the Net Sales Proceeds

> were deposited along with [the debtor's] other proceeds in bank accounts, and thereafter transferred at [the debtor's] request to certain blocked accounts established by [the debtor who then] entered into a credit agreement with a syndicate of banks and financial institutions headed by General Electric Capital Corporation ("GECC").  … GECC would sweep all funds from the blocked accounts into a concentration account, and apply them according to the terms of the credit agreement.  GECC would then advance money to [the debtor] (as requested and within the limits of [the debtor's] available credit) by depositing money into a blocked Disbursement Account, which [the debtor] used to pay all of its operating expenses.

*Id.*  The debtor's financial condition deteriorated, and it failed to pay $8.9 million of Net Sales Proceeds to the plaintiff.

The plaintiff brought a claim directly against the debtor asserting that it owned the Net Sales Proceeds, and a claim against GECC because GECC refused to turn over the $8.9 million of Net Sales Proceeds that had been commingled with the debtor's other funds and swept by GECC.  In holding that the debtor owned the Net Sales Proceeds, not the plaintiff, the district court relied

-21-

on the fact that "[a]t no point were the Net Sales Proceeds segregated from the rest of [the debtor's] funds, or precluded from GECC's sweep of [the debtor's] blocked funds." *Id.* at *4. Thus, the plaintiff "had no control over the Net Sales Proceeds 'once the funds were placed in [the debtor's] cash management system.'" *Id.* (quoting *In re Ames Dept. Stores, Inc.*, 274 B.R. 600, 621 (Bankr. S.D.N.Y. 2002)). The district court affirmed the bankruptcy court's conclusion that the Net Sales Proceeds were property of the debtor, not the plaintiff. *Id.*

This holding then controlled the outcome of the plaintiff's action against GECC, which was premised on the theory "that GECC received money from Ames that was due to [plaintiff]." *LFD Operating, Inc. v. Gen. Elec. Capital Corp. (In re Ames Dept. Stores, Inc.)*, No. 06-cv-5394, 2008 WL 7542200, at *9 (S.D.N.Y. June 4, 2008). Based on the bankruptcy court's holding that the debtor's "payment to GECC was a proper use of [the plaintiff's] funds," *id.* at *11, the district court held that the plaintiff "is precluded from litigating here that GECC should not be permitted to keep the money it received from [the debtor] under principles of equity and good conscience." *Id.*

Like TA Dispatch attempts to argue that the Revolving Lender's awareness of the very existence of the Transaction Documents imposed some obligation to cause the Debtors to impose segregation requirements that are not required by the Transaction Documents themselves, the plaintiff in *LFD Operating* argued that "the existence of GECC's reserve account against [the debtor's] credit availability established that GECC was aware of [the plaintiff's] superior right to the [Net Sale Proceeds]." *Id.* The alleged awareness of the plaintiff's position was irrelevant to the equities: the district court rejected that position finding that it had already been resolved that the debtor was not precluded under its agreement with the plaintiff from commingling the Net Sale Proceeds and that the debtor "was free to pay whatever debts it chose with such funds." *Id.* (citations omitted).

Simply put, once the funds were commingled and deposited into the cash management system that involves a senior secured lender exercising its contractual right to sweep certain accounts, Defendant's interest in protecting its right to sweep all funds from the Lockbox Account favors Defendant in the Restatement analysis.

### 5.    As a Matter of Law, the Other Factors that Arguably Could Favor TA Dispatch are Outweighed by the Factors Supporting Defendant.

When analyzing the Restatement's factors together, they only can lead to one conclusion— that the Revolving Lender's conduct here was justified.  In *WaveDivision*, after weighing all of the Restatement factors, the Superior Court concluded that "[plaintiff] cannot meet its burden, even at this stage, of showing [that] defendants acted without justification."  *WaveDivision Holdings*, 2011 WL 5314507, at *13.  The court concluded that only one factor favored the plaintiff: the plaintiff's right which was interfered with.  *Id.* at **12-13.  As in *WaveDivision*, one factor alone does not show that the Revolving Lender's conduct here can be seen, as a matter of law, as improper and unjustified.  Accordingly, the Court should find as a matter of law that the well-pleaded facts and reasonable inferences drawn therefrom show only that Defendant's conduct in administering a revolving loan facility, including the processing of daily sweeps pursuant to deposit account control agreements executed by the Celadon Companies was justified.  Thus, Count I should be dismissed with prejudice.

### III.    The Complaint Fails to State a Claim Against the Revolving Lender for Unjust Enrichment.

In Count II of the Complaint, TA Dispatch alleges that the Revolving Lender knew that the swept account included funds owned by TA Dispatch, and was unjustly enriched by its "receipt and retention of the Swept Funds…." (Compl. ¶ 67, 71). This statement ignores both (i) the fact that the Revolving Lender was authorized and expressly permitted to receive funds from the Debtors' blocked account in accordance with the Prepetition ABL Credit Agreement and deposit

account control agreements with the Debtors (a fact acknowledged by TA Dispatch), and (ii) the fact that Revolving Lender made routine advances of revolving loans to the Debtors pursuant to the Prepetition ABL Credit Agreement, resulting in outstanding Prepetition ABL Obligations of not less than $32,461,556.99 as of the Petition Date. (D.I. 230 at (E)(i).).  The fact that the Debtors commingled the funds at issue with the Debtors' other proceeds and deposited all commingled funds into the Lockbox Account *defeats* rather than supports the unjust enrichment claim.

An "[u]njust enrichment 'is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'  The elements of unjust enrichment are:  (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

### A.    Count II Should be Dismissed Because There is No Cause of Action for Unjust Enrichment Arising From a Breach of the Transaction Documents.

As an initial matter, as the unjust enrichment claim arises from a "relationship governed by contract, then that contract 'alone must provide the measure of the plaintiff's rights.'" *AM Gen. Holdings LLC v. Renco Grp., Inc.*, No. 7639-VCN, 2013 WL 5863010, at *15 (Del. Ch. Oct. 31, 2013) (quoting *Nemec*, 991 A.2d at 1131).  That principle applies, as is the case here, "even if the claim of unjust enrichment is alleged against a party who is not a party to the contract." *Id.* (citing *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) (granting motion to dismiss unjust enrichment claims to persons not party to a contract, and holding that "unjust enrichment cannot be used to circumvent basic contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it.").  Because the unjust enrichment claim is premised on a breach of the Transaction Documents, TA Dispatch's "remedy is limited to the remedies agreed to

it in the contract and it cannot avail itself of unjust enrichment as a cause of action." *AM Gen.*

*Holdings LLC*, 2013 WL 5863010, at *15.

> **B.     Count II Should be Dismissed Because Defendant Exercised Its Contractual Rights Under the Credit Agreement.**

Furthermore, Delaware law requires the dismissal of an unjust enrichment claim when, as

here, a plaintiff seeks to assert a claim against a defendant that merely exercised its absolute

contractual rights. *See In re Direct Response Media*, 466 B.R. at 661 ("CapSource exercised its

rights under the Amended CapSource Loan.  CapSource's exercise of its contractual rights under

the Amended CapSource loan is not an impoverishment to the Debtor or any creditor or an unjust

enrichment.  Therefore the unjust enrichment count is dismissed …"); *Nemec*, 991 A.2d at 1127

(affirming the dismissal a complaint claiming unjust enrichment, breach of fiduciary duty and

related claims, and finding that the defendants "did nothing unfair and breached no fiduciary duty

by causing the Company to exercise its absolute contractual right … at a time that was most

advantageous to the Company's working stockholders."). As in *Direct Response Media*, there was

no impoverishment or enrichment based on the Revolving Lender acting in compliance with its

absolute right under the Prepetition ABL Credit Agreement to implement cash management

procedures relative to the Lockbox Account and receive and apply the funds to its outstanding

balance pursuant to deposit account control agreements executed by the Celadon Companies.[13]

Further, and as argued in Section IIB(3), *supra*, there is no relation between the Revolving Lender's

receipt of swept funds and TA Dispatch's alleged "impoverishment" in light of the $32 million in

loans the Debtors had outstanding to the Revolving Lender as of the Petition Date.

---

[13] Moreover, there are no well-pleaded facts in the Complaint from which a reasonable inference can be made that the cash management procedures here "were implemented or utilized in an effort to frustrate the rights" of TA Dispatch. *In re Amp'd Mobile, Inc.*, 377 B.R. 478, 490 (Bankr. D. Del. 2007).

C.    **Count II Should be Dismissed Because TA Dispatch Cannot Show a Lack of Justification When the Debtors Commingled Their Funds.**

TA Dispatch's failure to show its impoverishment or Defendant's enrichment, or an absence of justification, is made even more clear by the fact that the Debtors did not segregate its accounts or hold the funds in trust for TA Dispatch. The commingling of funds is the ultimate flaw underlying the unjust enrichment claim. Because the funds were commingled, TA Dispatch is unable to trace the funds that supposedly impoverished TA Dispatch and enriched the Revolving Lender. As the Delaware Bankruptcy Court held in *In re Amp'd Mobile, Inc.*, 377 B.R. 478, 490 (Bankr. D. Del. 2007), "[t]he Debtor's practice of utilizing concentration accounts and daily sweeps renders it a practical impossibility for any party to trace, track or follow particular monies, beyond retained account balance amounts, after they enter the Debtor's cash management system."

To assist in determining parties' respective rights "in a commingled account, the [Third Circuit has] adopted the lowest intermediate balance rule." *Id.* at 489 (citing *Official Comm. of Unsecured Creditors of the Columbia Gas Transmission Corp. v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039, 1063 (3d Cir. 1993)). TA Dispatch's equitable right to assert an unjust enrichment claim seeking the return of funds it claims the Debtors paid to, and have allegedly enriched, the Revolving Lender, is controlled as a matter of law by the lowest intermediate balance test or "LIBT". That is because the trust beneficiary loses "all rights in the trust funds when the commingled account is entirely dissipated." *Coronation Sheet Metal Co. v. Interchange Bank (In re KI Liquidation, Inc.)*, No. 08-cv-611, 2008 WL 5109369, at *4 (D.N.J. Dec. 1, 2008).

The facts in *KI* completely parallel the facts here. In *KI*, the government awarded the debtor a contract to build an embassy. The contract did not include an express provision that funds paid to the debtor were to be held in trust for the debtor's subcontractors or suppliers. 2008 WL

5109369 at *1. Instead, the debtor was to timely pay its subcontractors and suppliers from the proceeds of the government payments. *Id.* The debtor also had a loan secured by its assets, including its bank accounts. *Id*. at *2. The debtor maintained a bank account that its lender debited each month, and applied to the debtor's outstanding loans. *Id.* The debtor transferred the funds it received from the government to the sweep account, which the lender swept and applied to pay down the secured loan. *Id.* The debtor lost the government contract, was unable to pay its subcontractors and suppliers, and filed for bankruptcy protection. *Id.*

The plaintiff supplier sued the debtor and its lender, claiming that the debtor held the funds in trust for the plaintiff, that the lender therefore held the funds in trust for the plaintiff, that the lender "wrongfully converted trust funds" when it swept an account, leaving a zero balance in the account, and used the swept funds to pay down its secured loan. *Id.* The bankruptcy court granted summary judgment to the debtor and its lender and dismissed the adversary proceeding with prejudice. *Id.* The bankruptcy court held that the government payments "are not subject to a constructive or equitable trust," and further "applying the lowest intermediate balance test" found that the plaintiff "failed to show that the alleged trust funds, which were commingled, were clearly traceable or identifiable." *Id.* **2-3.

The district court affirmed, finding that to "impose a trust, a court must find that the recipient (1) obtained the property through a wrongful act, and (2) will be unjustly enriched by retaining the property." *Id.* at *5. Importantly, the district court found that a "plaintiff claiming trust benefits must identify and trace the alleged trust funds if they are commingled." *Id.* (citing *Goldberg v. N.J. Lawyers' Fund for Client Protection*, 932 F.2d 273, 280 (3d Cir. 1991)). Imposing a tracing obligation on a plaintiff has a clear goal: it "protects the interests of secured

and unsecured creditors." *Id*. (citing *In re Columbia Gas*, 997 F.2d at 1063). As the district court explained:

> Where trust funds are commingled with non-trust funds, the lowest intermediate trust balance test is used to trace the trust funds. Under this test, the trust beneficiary may "assume that trust funds are withdrawn last from a commingled account." However, trust money that has been removed from the commingled account is not replenished by subsequent deposits. … Trust beneficiaries lose all rights in the trust funds when the commingled account is entirely dissipated.

*Id*. (citing and quoting *In re Columbia Gas Sys., Inc.*, 997 F.2d at 1063, 1064).

Thus, the LIBT focuses on the amount left in a commingled account after transfers are made out of the account to determine if the plaintiff has any rights in the commingled funds. In *KI*, the lender "swept KI's bank account … leaving it with a zero balance. Thus, zero is the lowest intermediate balance of the alleged trust funds in the commingled [lender's] account, and [plaintiff] can recover nothing." *Id*. at *8 (internal record citations omitted) (citing *In re Columbia Gas Sys. Inc.*, 997 F.2d at 1063; *EBS Pension, LLC v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.)*, 268 B.R. 409, 414 (Bankr. D. Del. 2001) (describing the holding as "that under the LIBT, trust funds were completely dissipated and thus, lost to claimant where the commingled account was swept to a zero balance")). *See also In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 578 (3d Cir. 1981) ("The matter is analogous to a glass of water, 95% of the contents of which is poured out. If the glass is refilled and 95% again poured out and the whole process repeated many times, very little of the original water will remain. However, no one can say that none of it is still there. But, if the glass is completely emptied, one can state with assurance that none of the original water is there any more. In the case at bar, the glass has been completely emptied and the [plaintiffs] are seeking priority on the water in the pitcher. This is something they have no right to. [The lender] has a mortgage on that water.").

Courts applying the LIBT must disregard a plaintiff's equitable claim of harsh or unfair outcomes, favoring instead the protections and certainties the test provides to secured creditors. Thus, in *KI*, the district court rejected the plaintiff's equity arguments that the LIBT's "application would 'result in an unjust outcome.'" *KI Liquidation, Inc.*, 2008 WL 5109369, *7; *id*. at *8 (plaintiff argued that the "LIBT should not be applied to this action because it would benefit … [the bank] to the detriment of [plaintiff].").

Applying *In re Columbia Gas Systems Inc.*, *KI*, *EBS Pension*, and the LIBT to the Complaint, and assuming all reasonable inferences from the well-pleaded facts, the Court should dismiss the unjust enrichment claim with prejudice. The Prepetition ABL Credit Agreement (and the deposit account control agreement effectuating it) makes clear that the Revolving Lender was entitled to receipt of "all" funds in the Lockbox Account. *See* Exh. B at § 2.11(a) ("*All* funds deposited into a Lockbox Account shall be transferred into the Payment Account by the close of each Business Day.") (emphasis added). Thus, the funds deposited in the Lockbox Account were completely dissipated, and only a zero balance was left after each sweep. Applying the LIBT to the well-pleaded facts, and those undisputed facts of which this Court should take judicial notice, means that "zero is the lowest intermediate balance of the alleged trust funds in the commingled [lender] account, and [TA Dispatch] can recover nothing." *In re KI Liquidation*, 2008 WL 5109369, at *8. *See also In re Amp'd Mobile, Inc.*, 377 B.R. at 490 ("The Debtor's practice of utilizing concentration accounts and daily sweeps renders it a practical impossibility for any party to trace, track or follow particular monies, beyond retained account balance amounts, after they enter the Debtor's cash management system."). Even if TA Dispatch's plight is sympathetic, "its position is not unique: it provided goods and services to a company that went into bankruptcy, and now it has a claim in the bankruptcy case for those unpaid goods and services." *Id*., 377 B.R. at

490. TA Dispatch's position does not merit imposition of a constructive trust on commingled funds based on an equitable theory such as unjust enrichment. *Id.*; s*ee also Ames Dept. Stores, Inc.*, 2004 WL 1948754, at \*5 (a "mere failure to pay a debt cannot support a constructive trust").

Ultimately, TA Dispatch has not adequately pleaded facts showing the absence of justification. Pursuant to the LIBT, the Revolving Lender did not act without justification in receiving the swept funds and applying them to the outstanding loan balance on the secured loans. The lack of justification is further laid out in detail in Sections IIB(1)-(5), *supra*. Thus, the Court should dismiss Count II, and the derivative Count III.

<u>**CONCLUSION**</u>

This motion calls upon the Bankruptcy Court to protect secured creditors' rights to enter into standard revolving secured credit and related agreements that establish a cash management system utilizing a lockbox account with daily sweeps of *all* deposited funds, without fear that an unsecured creditor claiming that the debtor failed to pay its contractual debts can seek to claw back its loan payments. It was incumbent on TA Dispatch to contract with the Debtors to segregate certain receivables if it wanted them held in trust and not to allow the Debtors to utilize the receivables to operate their business. TA Dispatch failed to do so, and the Debtors commingled the receivables and deposited them into accounts knowing that they would be swept and applied to Defendant's outstanding secured loan balance. The LIBT is intended to protect secured creditors like Revolving Lender that simply followed their absolute rights as expressed in the loan agreements and related documents in a justifiable manner when it received all funds swept from the Debtors' bank accounts, resulting in a zero deposit balance. Because TA Dispatch cannot trace the swept funds, it has lost any legal or equitable interest to those funds. For these and all the other many reasons provided herein, the Court should grant the Motion to Dismiss Adversary Proceeding in its entirety and dismiss the Complaint with prejudice.

Dated:  January 31, 2020                 MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: */s/ Eric D. Schwartz*

Eric D. Schwartz (No. 3134)
Thomas W. Briggs, Jr. (4076)
Matthew B. Harvey (No. 5186)
Barnaby Grzaslewicz (No. 6037)
Paige N. Topper (No. 6470)
1201 North Market Street, P.O. Box 1347
Wilmington, DE 19899-1347
Telephone:  (302) 658-9200
eschwartz@mnat.com
tbriggs@mnat.com  mharvey@mnat.com
bgrzaslewicz@mnat.com
ptopper@mnat.com

-and-

David E. Morrison
Danielle D. Juhle
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
Telephone:  (312) 201-4000
Facsimile:  (312) 332-2196
david.morrison@goldbergkohn.com
danielle.juhle@goldbergkohn.com